**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| THE COMMITTEE CONCERNING COMMUNITY IMPROVEMENT, et al, | CASE NO. CV-F-04-6121 LJO DLB |
|---|---|
| Plaintiffs, | **ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE SUMMARY ADJUDICATION** |
| vs. | |
| CITY OF MODESTO, et al, | |
| Defendants. | |
| _____/ | |

The following motions are pending before this Court:

(1) Defendant City of Modesto and the County of Stanislaus joint motion for summary judgment or in the alternative, summary adjudication, on the claim that the defendants' Master Tax Sharing Agreement discriminates against Latinos; and

(2) The County's motion for summary adjudication on any remaining claims for alleged discriminatory annexation; and

**FACTUAL AND PROCEDURAL BACKGROUND**

This is an action for declaratory and injunctive relief by plaintiffs The Committee Concerning Community Improvement, South United Neighbors and individuals living in certain unincorporated areas  in the County of Stanislaus.  The individual plaintiffs reside in unincorporated County islands

1

within the City of Modesto's sphere of influence.[1]  The unincorporated islands are primarily inhabited by Latinos.    These neighborhoods are informally known as "Bret Harte," "the Garden," "Rouse-Colorado," "No Man's Land" or "Hatch-Midway" and "Robertson Road." Plaintiffs allege that these Latino neighborhoods receive fewer and poorer public services than other neighborhoods in Modesto with predominantly white populations.  The public services include lack of sidewalks and street lights (Third Amended Complaint "TAC" ¶38-41), lack of effective law enforcement (TAC ¶42-43), lack of bilingual services (TAC ¶44-45), inadequate storm drainage and sewage disposal (TAC ¶46-50), use of the Latino neighborhoods as dumping grounds (TAC 51-52).  Among the harms alleged is that the lack of adequate law enforcement protection and adequate street lighting, the few open spaces that exist in some of these Latino Neighborhoods have become magnets for prostitution and drug use, creating, among other things, a dangerous environment for children.  (TAC 53-55.)

The Third Amended Complaint, filed on February 16, 2007, alleges the County and the City violated plaintiff's rights by:

> (1) denial of Equal Protection and Civil Rights (42 U.S.C. §1983) based on Defendants' (a) implementation of the annexation scheme (¶71); and (b) denied of services that are available to others in the City and County in a way that intentionally discriminates against Plaintiffs on the basis of race, ethnicity etc. (¶70);
> (2) violation of Title VI of the Civil Rights Act of 1962, 42 U.S.C. § 2000d and 42 U.S.C. §1983 based on the City and County's use of federal funds in providing services and annexation in a discriminatory manner (¶74);
> (3) violation of the California Fair Employment and Housing Act, Govt.Code §12955(l) based on Defendants' use of public land use practices in providing pubic services (¶77);
> (4) violation of California Govt Code §11135 and 22 CFR §98000-98413 based on Defendants' use of State funds in providing services in a discriminatory manner (¶80-81); and
> (5) common law and statutory nuisance based on interference with Plaintiffs' use and enjoyment of their land. Plaintiffs seek declaratory and injunctive relief.

---

[1]A sphere of influence is defined as "a plan for the probable physical boundaries and service area of a local agency." *Placer County Local Agency Formation Com'n v. Nevada County Local Agency Formation Com'n*, 135 Cal.App.4th 793, 806, 37 Cal.Rptr.3d 729, 738 (2006), citing Govt. Code 56076.  "A sphere of influence is a flexible planning and study tool to be reviewed and amended periodically as appropriate." *City of Agoura Hills v. Local Agency Formation Com.*, 198 Cal.App.3d 480, 490, 243 Cal.Rptr. 740 (1988).

**Master Tax Sharing Agreement and Annexation**

Additional allegations in the TAC are directly relevant to this motion.  Plaintiffs allege discriminatory practices in annexation.  First, plaintiffs allege the purpose and content of the Master Tax Sharing Agreement:

> "59.   The City and the County have entered into a Master Tax Sharing Agreement, which governs how property tax revenues will be shared between the City and the County once land passes from the County to the City through annexation. The agreement facilitates annexations by having the tax sharing issue worked out in advance, and by explicitly prohibiting the County from objecting to any covered annexation based on its fiscal impacts. But most of the Plaintiff Neighborhoods (Bret Harte, Robertson Road, and Hatch- Midway) are excluded from the scope of the tax sharing agreement, as are certain other predominantly Latino islands. Predominantly White islands are not excluded from the scope of the agreement."

Plaintiffs allege that because Latino islands are excluded from the Master Tax Sharing Agreement, they face barriers to annexation. (TAC ¶60.)  "Before any area excluded from the Master Tax Agreement may be annexed, the City and County must negotiate and agree on the adjustment of the allocation of property tax revenue between the City and County."  (TAC ¶60.)  Plaintiffs allege that this disparate treatment "creates a disincentive for the County to build infrastructure in the Plaintiff Neighborhoods since building such infrastructure to City standards does not assure that the City will not demand additional financial concessions from the County by way of tax sharing as a prerequisite to annexation of the Plaintiff Neighborhoods."  (TAC ¶61.)  Plaintiffs also allege: "Stanislaus County has made its annexation decisions in a discriminatory fashion." (TAC ¶64.)  Thus, plaintiffs' MTSA claim alleges discrimination in a failure to reach agreement on tax sharing for Latino neighborhoods that makes it more difficult for them to get annexed than white neighborhoods.

**Judge Coyle's December 30, 2004 Order on Annexation**

As relevant to the pending motions, in December 2004, District Judge Robert E. Coyle dismissed claims for discriminatory annexation.  The City had moved to dismiss claims based on the city's failure to annex or propose annexation of the ground that the City does not approve annexations.  On December 30, 2004, Judge Coyle issued an order dismissing any claims regarding annexation because (a) the City does not approve or disapprove annexations; and (b) Plaintiffs have no claim against the City for failing

3

1   to seek annexation because they never made any application for annexation except in one instance

2   beyond the statute of limitations. (Doc. 49.) Judge Coyle also acknowledged Plaintiffs' concession that

3   the City was not required to provide municipal services to unincorporated areas and instructed Plaintiffs

4   to remove any such allegations.

5         The Court dismissed the claim for discriminatory annexation or discriminatory refusal to

6   propose annexations. (Doc. 49.) The Court acknowledged that the local agency formation commission,

7   LAFCO, has the power to approve or disapprove proposals for the annexation of territory into a city.

8   *LIFE Committee v. City of Lodi*, 213 Cal.App.3d 1139, 1144-1145 (1989). The Court stated that "the

9   City has no power to reject an annexation approved by LAFCO." (Doc. 49, p.34:9-10.) The Court noted

10  that only one application for annexation had ever been filed:

11        "[T]he only application for annexation of one of the Latino
          unincorporated areas was that submitted for the Bret Harte neighborhood
12        in 1988. It is alleged that the application did not proceed because the
          City and the County were unable to reach agreement on revenue sharing.
13        As noted, no application or annexation of the Latino unincorporated areas
          by residents of the [sic] any of the Latino unincorporated areas have been
14        made since. Therefore, plaintiffs' argument that a revenue sharing
          agreement reached between the City and the County would facilitate the
15        approval of an annexation application by LAFCO is meaningless in the
          absence of an application." (Doc. 49, p.36:11-21.)

16

17  The Court said that whether the City could or could not facilitate annexation was "meaningless" absent

18  an application for annexation." (Doc. 49 p. 39:9-12.)   The Court held that, "[b]ecause the only

19  application for annexation was made in 1988, the court concludes that plaintiffs cannot proceed against

20  the City on the theory that the failure by the City to propose annexation of the Latino unincorporated

21  areas is based on discrimination." (Doc. 49, p.p.45: 18-22.) Accordingly, the Court granted defendants'

22  motion to dismiss the annexation allegations.

23  **Amendments to the Complaint**

24        On April 6, 2005, Plaintiffs filed their First Amended Complaint ("FAC"). The City  moved to

25  strike because the FAC was inconsistent with Judge Coyle's ruling. By stipulation, Plaintiffs withdrew

26  the FAC and filed a Second Amended Complaint ("SAC") on May 24, 2005. The SAC did not contain

27  a Fair Housing Act claim, a discriminatory annexation claim, or a claim that the City is obligated to

28  provide the same services to unincorporated areas that it  provides to incorporated areas. Plaintiffs'

4

1  remaining claims were framed as discrimination in the provision of voluntary municipal services in

2  White unincorporated areas compared to Latino unincorporated areas.

3       The parties subsequently entered into an Agreement ("the Agreement") on August 31, 2005,

4  limiting Plaintiffs' case to three services voluntarily provided to unincorporated areas sewers, police

5  service and bilingual assistance in police service.

6       Thereafter, plaintiff sought leave to file a Third Amended Complaint, to among other things,

7  clarify failure to provide municipal services in a non-discriminatory manner, including through the

8  addition of details concerning the City's implementation of its "Measure M" policy, the City and

9  County's failure to provide infrastructure in the Plaintiff Neighborhoods, and the role played by the

10  exclusion of the Plaintiff Neighborhoods from the "Master Tax Sharing Agreement."  Judge Beck

11  permitted the filing of the Third Amended Complaint to make these allegations.

12  **DEFENDANTS' MOVING ARGUMENTS**

13  **Grounds for Motion**

14      1.    The MTSA claim is barred by

15          A.    Judge Coyle's order as to both the City and County

16          B.    Judge Coyle's order that the claim is not ripe until an application for annexation

17             is filed.

18          C.    Against the City because the parties agreement limiting the services challenged.

19          D.    The statute of limitations.

20      2.    No triable issue of fact exists that the MTSA exceptions are intentionally discriminatory.

21      3.    Plaintiffs' state law claims

22          A.    On the FEHA, is inapplicable to already acquire housing,

23          B.    The MTSA confers no benefit of value on Anglo islands,

24          C.    Should be remanded to state court.

25

26      **MTSA Claim is barred by the Statute of Limitations**

27       The MTSAs were signed in 1983 and 1996.  This case was filed in August 2004.  The claim

28  accrues when the plaintiff knows or has reason to know of the injury.  *Stanley v. Trustees of Cal. State*

1   *Univ.*, 433 F.3d 1129, 1136 (2006).

2       Plaintiffs' MTSA annexation claim is barred by Judge Coyle's order and the statute of

3   limitations.  Judge Coyle has ruled that City's failure to facilitate the 1988 Bret Harte application for

4   annexation was barred by the statute of limitations.  (Doc. 49, Coyle order p. 42.)  Yet, in ¶60 of the

5   TAC, plaintiff assert the same failure to agree on allocation of property tax sharing for Bret Hart, a part

6   of their MTSA claims.

7       The exceptions in the MTSA were set forth in 1983 and 1996 -for Bret Harte, Robertson Road

8   and hatch-Midway - and have not changed since 1996.

9       **No Evidence of Intentional Discrimination (Count 1 and 2)**

10      Count I, claims for equal protection violation, and Count 2, claim for Title VI violation, both

11  require proof of intentional discrimination.  "Title VI itself directly reach[es] only instances of

12  intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 281, 121 S.Ct. 1511, 1516 (2001).

13      Defendants argue that plaintiffs have no evidence of intentional discrimination.  There is no

14  evidence that the City is refusing to agree on tax sharing for Latino islands in order to avoid annexing

15  them because they are Latino.

16      **FEHA claims**

17      Count 3 alleges discrimination in violation of the California FEHA, Govt. Code §12955(l) which

18  prohibits discrimination in "land use practices . . . that make housing opportunities unavailable."

19  Plaintiffs' housing opportunities are not affected by the MTSA because they already own or rent their

20  residences - it is inapplicable to <u>already acquired housing</u>.  The Federal Fair Housing Act claim was

21  dismissed by Judge Coyle for the same reason.

22      Count 4 alleges violation of Gov. Code §11135 for "disparate impact."  Plaintiffs, however, have

23  no material evidence of disparate impact caused by the MTSA exceptions.

24                  **Plaintiffs' Opposition Arguments**

25  **Overview**

26      The MTSA is designed to facilitate annexation of areas within the City of Modesto's Sphere of

27  Influence by satisfying, in advance, the annexation requirement that the City and the County agree on

28  the sharing of property tax revenues from the area to be annexed.  The MTSA excludes eight majority

Latino islands, yet includes all of the predominately white islands.  The only explanation offered for the exclusion of the islands is that they had unmet infrastructure needs.  Exclusion from the MTSA frustrates and chills Plaintiffs' annexation efforts because it discourages residents from pursuing annexation.  Exclusion of a neighborhood from the MTSA creates substantial uncertainty about whether an annexation attempt could succeed.  Exclusion of the Plaintiff neighborhoods from the MTSA also deters County infrastructure spending. County policy favors building infrastructure in the islands to City standards so that the County can cede responsibility for the islands by getting them annexed to the City.

There is circumstantial evidence to support an inference of intentional discrimination that the Latino neighborhoods were excluded from the MTSA for intentionally discriminatory reasons.  Statistics demonstrate a strongly disparate impact on Latino neighborhoods.  There is also evidence of markedly different approaches being pursued by the City to the annexation of White neighborhoods as compared to Latino neighborhoods.  The MTSA theory does not seek annexation.  It seeks only to end the present, ongoing impacts of the discriminatory exclusion of the Plaintiff neighborhood from the MTSA – chilling Plaintiffs' annexation efforts and deterring County infrastructure spending. Plaintiffs challenge an ongoing policy, entered outside the limitations period but continuing in force during the limitations period and injuring Plaintiffs during the limitations period.

**Plaintiffs' Statement of Facts**

The Infrastructure Conditions in Bret Harte, Hatch-Midway, and Robertson Road, three majority-Latino islands, lack basic infrastructure and services, such as storm drains, sidewalks, curbs and gutters, and adequate law enforcement. (Plaintiffs' Statement of Disputed Fact "PSDF" 55.) The City will not annex islands unless the County first installs the infrastructure the islands lack. PSDF 56.  The County desires to upgrade the infrastructure in the islands so that it can cede responsibility for them to the City.

**The MTSA:** Unincorporated land—including islands—cannot be annexed by the City unless and until the City and County agree on a sharing of property tax revenues from the land in question. Cal. Rev. & Tax Code § 99(b)(8).  The City and County entered a Master Tax Sharing Agreement in 1983 and agreed to property tax revenues sharing for unincorporated land.  This 1983 MTSA excluded a limited number of islands, however, such as Bret Harte and Robertson Road. In 1996, the City and County entered into a new MTSA, but it excluded 8 majority Latino islands, and the plaintiff

neighborhoods of Bret Harte, Robertson Road and Hatch-Midway were excluded.  The 1996 MTSA is renewed every year unless the City and County choose otherwise.

Using the census data for 1990 and 2000, the 1996 MTSA had a disproportionately negative effect on Latino islands. Three times as many Latino island residents were in the excluded islands.

**Negative impact of MTSA exclusions:** The MTSA represents a real impediment to annexation. Neighborhood Bret Harte's attempt to be annexed in 1988 failed when the City and County could not agree on the tax revenue sharing (the City demanded 100% of the property taxes).   A white neighborhood, Fairview Village area, was co-sponsored by the city.  Exclusion of a neighborhood from the MTSA means that the County could spend large sums to develop infrastructure in the neighborhood, but still have the City refuse to agree on tax sharing, which would prevent the County from shedding its responsibility for the neighborhood. PSDF 64.

**Plaintiffs' Arguments**

**The Exclusions From The MTSA Have A Strongly Disparate Impact Upon**

**Latino Neighborhoods.**

Plaintiffs' Cal.Govt. Code §11135 claim may be proved by disparate impact.  The MTSA has a strongly disparate impact on Latinos.  The MTSA negatively impacts the disproportionately Latino areas it excludes.  Eight island neighborhoods are specifically excepted from the MTSA. PSDF 3, 10. All are predominantly Latino.  Defendants argue that some non-island areas are also excluded - but failed to mention these are industrial/commercial areas, not residential.[2]

Defendants have articulated no legitimate rationale for the MTSA's exclusion of Latino Islands. Plaintiffs' prima facie showing of the MTSA exclusions' disparate impact on Latinos, Defendants must articulate a nondiscriminatory basis for those exclusions.  The only basis is the unmet infrastructure demands. This is pretextual because the majority-white unincorporated islands that are not excluded from the MTSA also have unmet infrastructure demands. PSDF 25. The MTSA relates to sharing of tax revenues on an ongoing basis and does not address the up-front expenses required to build needed infrastructure such as sewers, storm drains, sidewalks, and curbs and gutters.

---

[2] Plaintiffs argue that Defendants include a chart in their brief listing different areas excluded from the MTSA, which includes population statistics for the "Salida" area.  However, the "Salida" area is not in the City's Sphere of Influence.

**The Evidence Raises An Inference Of <u>Intentional</u> Discrimination**

The discriminatory application of the MTSA suggests that defendants acted with discriminatory intent when they excluded Latino islands from the MTSA.  First, Plaintiffs' unrebutted evidence of the disparate impact of the MTSA exclusions "provide[s] an important starting point" for determining Defendants' intent in excluding Latino islands from the MTSA. Second, the history of the MTSA provides further evidence that the excluded Latino neighborhoods were excluded because they were heavily Latino.  The excluded areas included the six most heavily Latino islands as of 1990, and were becoming more so. PSDF 20.  Using the 2000 data, and again including Emerald Elm, the MTSA excluded nearly two and a half times as many Latinos as it included, but included more non-Latinos than it excluded.  By 2000, every residential island excluded from the 1996 MTSA and not governed by a separate tax-sharing agreement was majority-Latino.

Other circumstantial evidence further supports an inference of intentional discrimination. Neighborhood Bret Harte was the only annexation to fail in 29 years.  It stands in stark contrast to the annexation of El Vista No. 4 (77 acres) and Pelandale-McHenry CPD - both predominantly white, which were annexed without infrastructure.  (PSDF 39-41.)

There is record evidence that high-ranking decision-makers within the City harbored racial animus toward Latinos.  Former City Council member William Conrad testified that former Mayor Dick Lang made derogatory comments about Latinos who had spoken at City Council meeting. Mr. Conrad also testified that the "downtown Modesto crowd" had expressed bias against Latinos when an affordable housing proposal was being considered. PSDF 66. Such testimony supports an inference that the City, through its representatives, was engaged in intentional discrimination against Latinos.

## <u>ANALYSIS AND DISCUSSION</u>

**A.    <u>Summary Judgment Standard</u>**

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact."  F.R.Civ.P. 56©; *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467 (1962); *Jung v. FMC Corp.*, 755 F.2d 708, 710 (9th

Cir. 1985); *Loeh v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984). The criteria of "genuineness" and "materiality" are distinct requirements. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The requirement that an issue be "genuine" relates to the quantum of evidence the plaintiff must produce to defeat the defendant's summary judgment motion. There must be sufficient evidence "that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

"As to materiality, the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial," and in such circumstances, summary judgment should be granted "so long as whatever is before the . . . court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56©, is satisfied." *Celotex Corp. v. Catarett*, 477 U.S. 317, 322 (1986). "If the party moving for summary judgment meets its initial burden of identifying for the court those portions of the material on file that it believes demonstrates the absence of any genuine issues of material fact," the burden of production shifts and the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quoting F.R.Civ.P. 56(e)).

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968) *T.W. Elec. Serv.*, 809 F.2d at 631. The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted). The opposing party's evidence is to be believed and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255; *Matasushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

10

1    B.        **Equal Protection and Discrimination under 42 U.S.C. §2000d**

2         Plaintiffs allege two federal claims of discrimination.  Both claims require proof of

3    intentional discrimination.  Plaintiffs filed a civil rights, 42 U.S.C. § 1983 ("Section 1983") action,

4    alleging Equal Protection violations and violation of Title VI (42 U.S.C. §2000d).

5         Section 1983 "creates a private right of action against individuals who, acting under color of

6    state law, violate federal constitutional or statutory rights."  *Squaw Valley Development Co. v.*

7    *Goldberg*, 375 F.3d 936, 943 (9th Cir. 2004).

8         1.        **Standards of Proof of Equal Protection Violations**

9          To state a viable Equal Protection claim under Section 1983, "a plaintiff must show that the

10   defendants acted with an intent or purpose to discriminate against the plaintiff based upon

11   membership in a protected class." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir.2001).

12   Proof of racially discriminatory intent or purpose is required to show a violation of the Equal

13   Protection Clause.  *City of Cuyahoga Falls, Ohio v. Buckeye Community Hope Foundation*, 538 U.S.

14   188, 194, 123 S.Ct. 1389, 1394 (2003).

15        Official action will not be held unconstitutional solely because it results in a racially

16   disproportionate impact. "Disproportionate impact is not irrelevant, but it is not the sole touchstone

17   of an invidious racial discrimination." *See Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040,

18   2049 (1976) (holding that disparate impact is insufficient for an Equal Protection Clause violation

19   claim). Indeed, proof of discriminatory intent is required to show that state action having a disparate

20   impact violates the Equal Protection Clause. *See Village of Arlington Heights v. Metropolitan*

21   *Housing Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The impact of the

22   official action whether it "bears more heavily on one race than another," may provide an important

23   starting point in the analysis. *Village of Arlington Heights v. Metropolitan Housing Development*

24   *Corp.*, 429 U.S. at 264-265, 266. Other evidence/factors may be considered:  The historical

25   background of the decision is one evidentiary source, particularly if it reveals a series of official

26   actions taken for invidious purposes. *Arlington Heights*, 429 U.S. at 267.  The specific sequence of

27   events leading up the challenged decision also may shed some light on the decision maker's

28   purposes. *Arlington Heights*, 429 U.S. at 267.  Departures from the normal procedural sequence and

1   the legislative or administrative history are also relevant. *Id.* At 268.

2       **2.    As Applied Challenge**

3       Here, plaintiffs do not challenge the MTSA facially, but argue that exempting out certain

4   neighborhoods of the MTSA is racially discriminatory as applied.  Plaintiffs argue the MTSA is

5   designed to facilitate annexation of areas within the City of Modesto's Sphere of Influence by

6   satisfying, in advance, the annexation requirement that the City and the County agree on the sharing

7   of property tax revenues from the area to be annexed.  The MTSA excludes eight majority-Latino

8   islands, among them plaintiff neighborhoods of Bret Harte, Robertson Road, and Hatch-Midway.

9       The MTSA shows no classification on its face, other than identification of neighborhoods,

10  which is facially neutral. "A facially neutral law ... warrants strict scrutiny only if it can be proved

11  that the law was 'motivated by a racial purpose or object,' or if it is 'unexplainable on grounds other

12  than race.' " *Hunt v. Cromartie*, 526 U.S. 541, 548, 119 S.Ct. 1545, 1549 (1999) (presented statistical

13  and demographic evidence on racial impact of re-districting).  "Analysis of an equal protection claim

14  alleging an improper statutory classification involves two steps. Appellants must first show that the

15  statute, either on its face or in the manner of its enforcement, results in members of a certain group

16  being treated differently from other persons based on membership in that group." *United States v.*

17  *Lopez-Flores*, 63 F.3d 1468, 1472 (9th Cir.1995), *cert. denied,* 516 U.S. 1982 (1996).  "Second, if it

18  is demonstrated that a cognizable class is treated differently, the court must analyze under the

19  appropriate level of scrutiny whether the distinction made between the groups is justified."

20  *Lopez-Flores*, 63 F.3d at 1472.

21      Courts have defined a facially suspect classification as, for example, a "governmental

22  standard, preferentially favorable to one race or another, for the distribution of benefits." *Raso v.*

23  *Lago*, 135 F.3d 11, 16 (1st Cir.), *cert. denied*, 525 U.S. 811, 119 S.Ct. 44, 142 L.Ed.2d 34 (1998)

24  (deriving the rule from *Adarand Constructors, Inc. v. Pena*, 515 U.S. at 226-27, 115 S.Ct. 2097 and

25  *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989)); see also

26  *Hayden v. Nassau*, 180 F.3d 42, 48 (2d Cir.1999) ("A statute or policy utilizes a 'racial classification'

27  when, on its face, it explicitly distinguishes between people on the basis of some protected

28  category").  The government action must bestow a benefit or burden, based on a suspect

12

1  classification, to taint the action with the stigma of invidious discriminatory intent. Only then is

2  heightened scrutiny required. "The Equal Protection Clause does not forbid classifications. It simply

3  keeps governmental decisionmakers from treating differently persons who are in all relevant respects

4  alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 2331 (1992).

5       Plaintiffs will need to show that the MTSA was applied in a manner that involved an

6  unconstitutional classification. *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220

7  (1886) (equal protection clause would be violated if the government selectively denied its protective

8  serves to certain disfavored minorities). Unless a classification trammels fundamental personal

9  rights or implicates a suspect classification, to meet constitutional challenge the law in question

10  needs only some rational relation to a legitimate state interest. *Lockary v. Kayfetz*, 917 F.2d 1150,

11  1155 (9th Cir. 1990). Unless a classification trammels fundamental personal rights or is drawn upon

12  inherently suspect distinctions ... our decisions presume the constitutionality of the ordinances  and

13  require only that the [ordinance] challenged be rationally related to a legitimate state interest. *Boone*

14  *v. Redevelopment Agency of City of San Jose*, 841 F.2d 886, 892 (9th Cir. 1988), *cert. denied,* 488

15  U.S. 965 (1988). Zoning and land use issues do not implicate fundamental rights, and thus, in order

16  to invoke strict scrutiny, plaintiffs must demonstrate that the City intentionally discriminated on the

17  basis of race. *Kawaoka v. City of Arroyo Grande*  17 F.3d 1227, 1239 (9th Cir. 1994), 513 U.S. 870

18  (1994); *Lockary v. Kayfetz*, 917 F.2d at 1155 (No fundamental right in water for real estate

19  development).[3]

20       **3.    Plaintiffs's Evidence of Intentional Discrimination**

21       Plaintiffs' point to three categories of evidence supporting a claim of intentional race

22  discrimination: first, the racially disparate impact upon the excluded neighborhoods; second, the

23

24       [3] In the present case, plaintiffs do not allege that the MTSA infringes upon their exercise of a constitutionally
    protected right. They claim that the MTSA "Chills" or is a barrier or impediment to annexation. Thus, they do not allege
25  that the MTSA forces them to forego an activity that, in and of itself, is constitutionally protected - annexation or sewer lines
    are not constitutionally protected.
26       Except for cases involving core First Amendment rights, the "existence of a 'chilling effect' ... has never been
    considered a sufficient basis, in and of itself, for prohibiting" government action. *Younger v. Harris*, 401 U.S. 37, 51, 91 S.Ct.
27  746, 754, 27 L.Ed.2d 669 (1971). As the Supreme Court has noted, "Allegations of a subjective 'chill' are not an adequate
    substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1,
28  13-14, 92 S.Ct. 2318, 2325-26, 33 L.Ed.2d 154 (1972).

1   history of prior white annexations and failed annexations, and third, racial comments made by the

2   former mayor.

3        **a.   Disparate Impact**

4        Plaintiffs are basically challenging the City's and County's tax sharing agreement as it relates

5   to annexation. "The effect of the MTSA is to frustrate Plaintiffs' annexation efforts and to deter

6   infrastructure development by the County. Exclusion from the MTSA frustrates and chills Plaintiffs'

7   annexation efforts because it discourages residents from pursuing annexation." (Plaintiffs

8   Opposition Brief p. 2.)  Plaintiffs argue that the City and County have created an impediment to

9   annexation efforts and discourages persons from pursuing annexation.

10       The MTSA was initially signed by the City and County in 1983. (Doc. 301, Def's Joint Reply

11   to "Undisputed Facts" Fact 1.)  As relevant to the facts in this case, it excepted out plaintiff

12   neighborhoods Bret Harte and Robertson Road.  (*Id.*)  Both were built in the 1940s and 1950s and

13   were majority white at the time.  (Id. Facts 7 and 8.)  It is undisputed that in 1983, the neighborhoods

14   were not majority Latino.   (Doc. 301, Def's Joint Reply to "Undisputed Facts" Fact 9.)  A later

15   amendment to the MTSA in 1996, excepted out plaintiff neighborhood Bret Harte, Robertson Road

16   and Hatch-Midway, among others. (Plaintiffs Opposition Brief p.5.)

17       Plaintiffs argue that the MTSA negatively impacts the disproportionately Latino areas it

18   excludes.  In 1996, eight island neighborhoods are specifically excepted from the MTSA, including

19   Bret Harte (76% Latino), Hatch-Midway (74% Latino) and Robertson Road (70% Latino). (Doc.

20   300, Defendants' Joint Response Fact 11.). These statistics, among others related to the Latino

21   population, are relied upon by plaintiffs.

22       There are two fundamental problems with the statistical evidence.  First, the above

23   percentages of each islands' Latino populations - Bret Harte (76% Latino), Hatch-Midway (74%

24   Latino) and Robertson Road (70% Latino) - are based on census statistics for the year 2000.  The

25   plaintiffs' argument ignores that at the time the MTSA was executed (1983) or amended (1996), the

26   neighborhoods were not majority Latino or not all majority Latino.   Bret Harte (32.7% Latino in

27   1980 and 56.3% Latino in 1990), Hatch-Midway (40.5% Latino in 1980 and 55.9% in 1990) and

28   Robertson Road (32.5% Latino in 1980 and 48% in 1990).  (See Doc. 278, Exh. LL to Brosnahan

1   Decl., Exh. 2 to Exh. LL, p. 24-25.)[4]  Thus, at the time the agreements were executed the statistical

2   variation in the neighborhoods was not significant.  *Gay v. Waiters' and Dairy Lunchmen's Union*,

3   694 F.2d 531, 552 (9th Cir.1982) ( A plaintiff may establish a disparate treatment claim with

4   statistical evidence alone, however, the statistics must show "a clear pattern" of discrimination,

5   "unexplainable on grounds other than race.")

6       In addition, plaintiffs' statistics do not account for the total Latino population of the

7   unincorporated areas.  *See Katz v Regent of the University of Ca.*, 229 F.3d 831, 835 (rejecting

8   statistical proof where plaintiff failed to relate impact to all the employees/population from the

9   employment decision), *cert. denied.*532 U.S. 1033 (2001).  Plaintiffs' selectively analyze the Latino

10  population within each of the three impacted county islands, but do not adequately statistically

11  analyze the Latino population in relation to either the total population or total Latino population.

12      The disparate impact alone cannot establish intentional discrimination. The Ninth Circuit has

13  rejected proof of intent by disparate impact in a case similar to the instant case. In *Hispanic Taco*

14  *Vendors of Washington v. City of Pasco*, 994 F.2d 676, 679 (9th Cir. 1993), vendors contended that

15  an ordinance imposing licensing fees on itinerant street vendors, deprived them of equal protection

16  of the laws based on their ethnicity in violation of the Fourteenth Amendment. On its face, the

17  ordinance did not discriminate against Hispanics. Nevertheless, the vendors asserted that the

18  ordinance was invalid because of its disproportionate impact on Hispanics.

19      The Ninth Circuit rejected the vendors' argument that the ordinance had such a severe

20  discriminatory impact on Hispanics that they are relieved of their burden of providing evidence of

21  discriminatory intent.  The disproportionate impact of the ordinance did not approach the level of

22  discrimination in cases where the Supreme Court had invalidated laws solely because of their

23  impact. See, e.g., *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960)

24  (Alabama legislature changed City of Tuskegee's boundaries so that all but a handful of the 400

25  African-American residents could not vote in city elections); *Yick Wo v. Hopkins*, 118 U.S. 356, 6

26  S.Ct. 1064, 30 L.Ed. 220 (1886) (San Francisco banned laundries in wooden structures, and then

27

28          [4] Plaintiffs argue that the defendants knew that the islands were trending towards more Latino population as time
    progressed, but offer no supporting evidence. (Doc. 273, Plaintiffs' opposition p. 12.)

1    issued variances to every white applicant but one and denied variances to every Chinese applicant);

2    See also, *PMG Intern. Div. L.L.C. v. Rumsfeld*, 303 F.3d 1163, 1172 -1173 (9th Cir. 2002) ("A

3    disparate impact claim, under the equal protection clause of the Fifth Amendment, challenging a

4    facially neutral-statute requires showing of discriminatory intent, or of a stark pattern of disparate

5    enforcement).

6          Likewise, here assuming the proof of plaintiffs' evidence that the MTSA has an impact on

7    Latinos, it does not necessary follow that the impact is <u>intentionally</u> discriminatory.[5]   It is undisputed

8    that the MTSA was adopted before the demographics in the islands became more Latino.  The

9    original selection of the MTSA excluded neighborhoods was not discriminatory, the islands were

10   Anglo.  (Doc. 301, Joint Response facts 1, 7-8.)  The MTSA adopted in 1996 excluded Latino

11   islands and white islands and unincorporated areas.  While the MTSA has a "renewing" provision

12   since 1995, there has not been a showing that alterations to the 1983 and 1996 MTSA were based on

13   racial make up of the neighborhoods as opposed to geographic location of the islands and cost

14   implications of infrastructure improvements. There is no evidence that racial or ethnic demographic

15   analysis or data was available, considered or relied upon in 1996 when the MTSA was amended.

16   (Doc. 301, Joint Response, Fact 24 (while plaintiffs "dispute" this fact, no evidence is provided.))

17   Summary judgment is appropriate when statistics do not support a disparate impact analysis. *See*

18   *Katz v Regent of the University of Ca.*, 229 F.3d 831, 835 (affirming summary judgment dismissal

19   where the plaintiffs were "unable to set forth a substantial statistical disparity that would raise an

20   inference of intentional discrimination").

21          Indeed, the Supreme Court has rejected the exact kind of statistical categorization as offered

22   by plaintiffs. In *Wards Cove Packing Co. v. Atonio* (1989) 490 U.S. 642, 109 S.Ct. 2115, 104

23   ─────────────────────

24         [5]Plaintiffs are in error that a showing of a disparate impact establishes a prima facie case and "shifts the burden."
     Plaintiffs cite *Harris v. Itzhaki*, 183 F.3d 1042, 1051 (9th Cir. 1999) for the proposition that once plaintiff establishes a prima

25   facie case of disparate impact, the burden shifts to defendants to articulate some legitimate, nondiscriminatory reason for the
     action. In *Itzhaki*, plaintiff brought claims under the Fair Housing Act, not under Equal protection.  For a Fair Housing Claim,

26   the Court "appl[ies] Title VII discrimination analysis in examining Fair Housing Act discrimination claims" and "A plaintiff
     can establish a FHA discrimination claim under a theory of disparate treatment or disparate impact." *Harris v. Itzhaki*, 183

27   F.3d at 1051.  An equal protection claim requires proof of intentional discrimination in which "disparate impact" is merely
     the "starting point."  *Arlington Heights*, 429 U.S. at 266.

28

L.Ed.2d 733 (*Wards Cove*), a class of nonwhite cannery workers sued for racial discrimination on the ground that the employers' hiring and promotion practices were responsible for racial stratification of the work force and that the workers had been denied employment on the basis of race. Evidence established that the employers had two general types of jobs at their canneries: unskilled cannery jobs on the cannery lines, which were filled predominantly by nonwhites, and noncannery jobs, most of which were classified as skilled positions and filled predominantly with white workers, and virtually all of which paid more than cannery positions. *Wards Cove*, 490 U.S. at pp. 646-647, 109 S.Ct. 2115.

The Court of Appeals relied solely on the plaintiffs' statistics showing a high percentage of nonwhite workers in the cannery jobs and a low percentage of such workers in the noncannery positions in finding a prima facie case of disparate impact had been established. The Supreme Court reversed, finding that the Court of Appeals "misapprehends our precedents" as well as the purpose of Title VII. *Wards Cove*, 490 U.S. at 650, 109 S.Ct. 2115. One analytical flaw identified by the *Wards Cove* court was "with respect to the skilled noncannery jobs at issue here, the cannery work force in no way reflected 'the pool of qualified job applicants' or the 'qualified population in the labor force.' " *Id.* at 651, 109 S.Ct. 2115. The "proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the qualified ... population in the relevant labor market." *Wards Cove*, 490 U.S. at 650. Thus, the plaintiffs failed to statistically prove impact in relation to <u>all</u> of the potential impacted population. Summary judgment in *Wards' Cove* was upheld.

In the instant case, it is legally insufficient for the plaintiffs to statistically analyze the Latino population within the plaintiff neighborhoods. The entire population or some similar statistical evaluation is required, as shown by competent evidence. (Doc.274, Facts 16- 21 - citing only to Exh. LL of Brosnahan decl.) Expert testimony is required to prove the statistical evaluation. (Doc. 278, Exh. B to Brosnahan Decl.-Expert James Johnson analyzing the statistical Latino population effected). Thus, the proof of disparate impact is legally insufficient.

Further, this Court has previously determined that discriminatory annexation is not a proper claim in this action. To the extent that the existence of the MTSA "chills" annexation efforts, that issue was, if not directly, implicitly addressed in Judge Coyle's Order on the Motion to Dismiss.

1    Annexation and impacts on annexation are not part of this lawsuit because there have not been any

2    applications for annexation, other than the Bret Harte application in 1988.  Plaintiffs seek to hold the

3    City and County liable for discriminatory annexation practices and their impacts.  To accept

4    plaintiffs arguments would be akin to adopting that intentional discrimination in hiring can be

5    claimed even though the person has never applied for the job for which they were allegedly

6    discriminated.[6]

7    _____      **b.    Historical Background**

8          The other evidence presented by plaintiffs relates to the historical background to annexation

9    efforts of other County islands or unincorporated areas. However, "the historical background for a

10   given decision is only one factor relative to intent. It does not, by itself, compel a court to find a

11   discriminatory purpose behind every statute passed during regrettable periods of a state's past."

12   *Burton v. City of Belle Glade*, 178 F.3d 1175, 1195 (9th 1999).

13         Plaintiffs present evidence of the alleged disparity between how other, primarily white,

14   islands were treated in possible annexation efforts.  Plaintiffs argue the City welcomed the

15   annexation of the White neighborhood El Vista No. 4 and aggressively pursued the annexation of

16   the Pelandale McHenry CPD, also a predominantly White neighborhood, while erecting barriers to

17   annexation and infrastructure development of predominantly Latino neighborhoods by excluding

18   them from the MTSA. Moreover, the City was a co-proponent of the Fairview Village annexation.[7]

19   Plaintiff also argue an inference of discrimination can be inferred because of the 1988 failed Bret

20   Harte annexation, the only one to have failed in 29 years.  (Doc. 273, Plaintiffs' Opposition, p.1.)

21   And, also because the unreasonably City demanded 100% of the revenue tax sharing in the Bret

22   Harte potential annexation.  (Doc. 300, Def's Joint Response Fact 30.)

23         The El Vista annexation was not similar because it was a non-island and did not require

24

25        [6] Judge Beck's statements in permitting the amendment to the complaint (City and County may have created an
     impediment to annexation efforts and discourages persons from pursuing annexation) is consistent with this position.
26   Amendments to pleadings are liberally granted.

27        [7] Plaintiffs argue that the annexation of Fairview Village was illegal under Govt.Code §56109 because the
     annexation left Bret Harte surrounded by the City .  (Doc. 273, Plaintiffs' Opposition p.6.)  The Court need not address the
28   legality or illegality of the Fairview Village annexation to resolve this motion.  In addition, while the City and County state
     that Fairview Village was minority, they do not cite any supporting evidence.  (Doc. 300, Def's Joint Response, Fact 49.)

1   County funding or an infrastructure agreement with the County.  The residents funded the

2   improvements through an improvement district.  (Osner Reply Decl. ¶3.)  Like El Vista, McHenry-

3   Pelandale is a non-island which has not been annexed and would be subject to privately financed

4   infrastructure and not County funding.  (Osner Reply Decl. ¶4.)

5       The last two pieces of evidence of the Historical background pertains to Bret Harte. It is

6   undisputed that the County's projected cost to upgrade all infrastructure in Bret Harte was $19

7   million and that the County share of the property tax revenue for Bret Harte in 1988 was $270,000.

8   (Doc. 301 Facts 14 and 16.)  The cost for all infrastructure improvements for all 26 islands $130

9   million.  (Doc. 301, Fact 23.) One failed annexation, remote in time, does not raise a disputed issue

10   of fact.  These historical annexation efforts do not demonstrate the <u>exclusion from the MTSA</u>, which

11   is plaintiffs' claim, was discriminatory.

12                 c.   **Alleged Discriminatory Statements**

13       Former City Council member William Conrad testified that former Mayor Dick Lang made

14   derogatory comments about Latinos who had spoken at City Council meetings. Mr. Conrad also

15   testified that the "downtown Modesto crowd" had expressed bias against Latinos when an affordable

16   housing proposal was being considered. PSDF 66. Plaintiff argues such testimony supports an

17   inference that the City, through its representatives, was engaged in intentional discrimination against

18   Latinos.

19       The bigoted comments of a few citizen, even those with power, should not invalidate action

20   which in fact has a legitimate basis. *Washington v. Davis*, 426 U.S. at 253 (Stevens, J., concurring

21   op.); *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227 (9th Cir. 1994) (bigoted statements were

22   insufficient to demonstrate that council member acted with discriminatory intent in light of

23   numerous legitimate reasons articulated by city to support its decisions; moreover, isolated

24   statements made by council member could not establish city's discriminatory intent), *cert. denied*,

25   513 U.S. 870.

26       The statements introduced by plaintiffs do not raise an issue of fact that the City's conduct

27   was intentionally discriminatory.  First, it is undisputed that the purported statements had nothing to

28   do with the MTSA.  Second, the purported statements are not identified as to time, thus, it would be

1    purely speculative to assume the statements were related in any way to the MTSA. (Doc. 278, Exh.

2    M p. 219-221.) Third, as a matter of law, the isolated statements of the mayor, do not show the City

3    acted with discriminatory intent in the absence of relating the statements to the MTSA, and a

4    showing that the Mayor was involved in the negotiations/voting for the MTSA.

5         Accordingly, because plaintiffs have failed to carry their burden of proof and to raise an issue

6    of fact, the Court will grant the motion as to the MTSA on the Equal Protection claim.

7    C.    **Proof of Title VI Violations**

8         Plaintiffs' second claim for relief is pursuant to Title VI , under 42 U.S.C. § 2000d, which

9    provides:

10             "No person in the United States shall, on the ground of race, color, or
               national origin, be excluded from participation in, be denied the
11             benefits of, or be subjected to discrimination under any program or
               activity receiving Federal financial assistance."
12        In  *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), the

13   Supreme Court held that private parties may not invoke Title VI regulations to obtain redress for

14   disparate-impact discrimination because Title VI itself prohibits only <u>intentional discrimination</u>.  The

15   entity involved must be engaged in intentional discrimination and be the recipient of federal funding.

16   *Rodriguez v. California Highway Patrol*, 89 F.Supp.2d 1131, 1139 (N.D.Cal.2000).

17        Plaintiffs' second claim also requires proof of intentional discrimination.  As shown, infra,

18   plaintiffs have failed to carry their burden to raise an issue of fact as to the intentional discrimination.

19   Accordingly, the motion will be granted on the second claims for relief as to the MTSA claim.

20   D.    **Statute of Limitations – Continuing Violations**

21        Defendants argue the statute of limitations bars the MTSA allegations.

22        Section 1983 does not contain a statute of limitations. In California, claims brought under

23   Section 1983 are governed by California's statute of limitations for personal injury actions. *Taylor v.*

24   *Regents of Univ. of Cal.*, 993 F.2d 710, 711-12 (9th Cir. 1993), *cert. denied*, 993 F.2d 710 (1993).

25   Plaintiff's Section 1983 claim is therefore governed by California's statute of limitations for personal

26   injuries under Section 335.1 of the California Code of Civil Procedure. Cal. Civ. Proc. Code § 335.1.

27   Currently, the limitations period is two years; however, prior to January 1, 2003, the limitations

28   period for personal injuries was one year. See Cal. Civ. Proc. Code § 340.3.

1    Although state law determines the length of the limitations period in Section 1983 actions,

2    federal law determines when a civil rights claim accrues. *Azer v. Connell*, 306 F.3d 930, 936 (9th

3    Cir.2002). "Under federal law, a cause of action generally accrues when a plaintiff knows or has

4    reason to know of the injury which is the basis of his action." Id. (citation and internal quotation

5    marks omitted). Once a person has information sufficient to put a reasonable person on notice, the

6    limitations period begins to run. *Knox v. Davis*, 260 F.3d 1009, 1013 (9th Cir. 2001) (citation

7    omitted).

8    This action was filed on August 18, 2004.  Defendants argue that the MTSA was adopted in

9    1983 and modified in 1996, well outside the statute of limitations.

10   Plaintiff argues the continuing violation doctrine is applicable because their claims are based

11   on systematic (or "systemic") discriminatory violations which are ongoing.  Plaintiffs argue that a

12   systematic policy of discrimination operated, in part, within the limitations period.  *Morgan*, 232

13   F.3d at 1015-16.[8]  Plaintiffs present evidence that the MTSA, initially adopted in 1983, rewritten in

14   1996, is automatically renewed every year since 2001.  The MTSA was formally amended in 2004

15   and the MTSA was most recently renewed in 2006.  (Doc. 300, Def's Joint Response, Fact 5-9.) The

16   2004 amendment expressly reaffirmed the provision of the agreement excluding the Latino areas

17   from the MTSA.

18   The Ninth Circuit has stated that a case involving a  "discriminatory system" may establish a

19   continuing violation.  *DeGrassi v. City of Glendora*, 207 F.3d 636, 645 (9th Cir. 2000), citing *Sosa v.*

20   *Hiraoka*, 920 F.2d 1451, 1455 (9th Cir.1990) (held that a pattern of racially discriminatory acts that

21   denied Sosa a promotion established a continuing violation.)  The "continuing violation" theory

22   allows courts to consider time-barred discriminatory conduct to demonstrate an ongoing, systematic

23   policy or practice of discrimination.  Pattern or practice discriminatory claims cannot be based on

24   "sporadic discriminatory acts" but rather must be based on discriminatory conduct that is widespread

25   _____

26   [8] Plaintiffs cite *Morgan v National Railroad Passenger Corp.*, 232 F.3d 1088 (9th Cir. 2000), which was affirmed
     in part and reversed in part by *National R.R. Passenger Corp v. Morgan*, 536 U.S. 101 (2002).  *National Railroad* did not

27   determine the "pattern or practice" continuing violations exception to the statute of limitations: "We have no occasion here
     to consider the timely filing question with respect to "pattern-or-practice" claims brought by private litigants as none are at

28   issue here."  *Id*. At 115 n.9.

1   throughout a company or that is a routine and regular part of the workplace. *Cherosky v. Henderson*,

2   330 F.3d 1243, 1247 (9th Cir. 2003) (no evidence to show the Postal Service widely discriminates

3   against employees with disabilities or even that it routinely discriminates with respect to respirator

4   requests), citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 52

5   L.Ed.2d 396 (1977); *Lyons v. England*, 307 F.3d 1092, 1107 (9th Cir. 2002) (plaintiffs will typically

6   rely upon statistical evidence of the employer's "past treatment of the protected group" and

7   "testimony from protected class members detailing specific instances of discrimination" to establish

8   a pattern or practice of intentional discrimination).

9        Here, plaintiffs have not introduced evidence of widespread discriminatory practices of

10   treating Latinos differently than other groups. The evidence related to alleged pattern and practice or

11   systemic discrimination relates solely to the Latino neighborhoods at issue.  As shown above, the

12   statistical analysis is insufficient to establish disparate impact upon Latinos, as a matter of law.

13   There is insufficient evidence to show a pattern or practice of discrimination such that acts outside

14   the statute of limitations are actionable.

15        Plaintiff argues that the MTSA has a renewing provision, and it was renewed in 2006, well

16   within the statute of limitations.

17        Here, the Court determines plaintiffs' claims are challenging the continual impacts or "ill

18   effects" of the original decision, not claims based on new discriminatory acts.[9]

19        In determining when an act occurs for statute of limitations purposes, the Ninth Circuit looks

20   at when the "operative decision" occurred, and separate from the operative decisions those inevitable

21   consequences that are not separately actionable.  *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045,

22   1058 (9th Cir. 2002) (the continued prosecution of a zoning violation action within the limitations

23   period was the inevitable consequence of the City's earlier initiation of the abatement proceeding).

24   In *RK Ventures*, the defendant City decided to institute formal abatement hearings prior to the

25   limitations period. *Id.* at 1058. The court held that the government processes arising from that

26

27        [9] So long as at least one, nondiscrete act occurs within the limitations period, plaintiff may recover for a course of discriminatory conduct that started before the limitations period. On the other hand, discrete acts that predated the limitations

28   period are not actionable. [See National Railroad Passenger Corp. v. Morgan (2002) 536 US 101, 110, 122 S.Ct. 2061, 2070-2071; Porter v. California Dept. of Corrections (9th Cir. 2004) 383 F3d 1018, 1027].

1   decision--the hearings themselves and the prosecution of the abatement action--were "inevitable

2   consequences" of the decision to initiate the proceedings and therefore were not actionable despite

3   occurring within the limitations period.

4        Here, the operative decision was the inclusion of the plaintiff neighborhoods in the MTSA.

5   This occurred in 1983 for plaintiff neighborhoods Bret Harte and Robertson Road and in 1996 for

6   plaintiff neighborhood Hatch-Midway.  The "ill effects" of the exclusion from the MTSA are the

7   inevitable consequences of the operative decision.

8        Continual ill effects of a governmental decision do not bring the decision within the statute of

9   limitations.  In *Tolbert v. State of Ohio Dept. of Transp.*, 172 F.3d 934, 940 (6th Cir. 1999), plaintiffs

10  claimed that city and state transportation department acted in racially discriminatory manner by

11  allocating limited funds to erect sound barriers for highway construction project in predominantly

12  Caucasian neighborhood, while not providing such barriers for similar project in predominantly

13  African-American community.  The Court held that the action accrued when the request by residents

14  of African-American community for sound barriers was denied and residents knew or should have

15  known that sound barriers were to be constructed around project in Caucasian neighborhood.

16  *Tolbert*, 172 F.3d at 940.  The court determined that "a continuing violation requires continued

17  action and not simply continuing harm or "[p]assive inaction."  As the Fourth Circuit noted in

18  *National Advertising Co. v. City of Raleigh*, 947 F.2d 1158, 1166 (4th Cir.1991), "[a] continuing

19  violation is occasioned by continual unlawful acts, not continual ill effects from an original

20  violation." (internal quotation marks and citations omitted), *cert. denied,* 504 U.S. 931 (1992).

21       In  *Knox v. Davis*, 260 F.3d 1009, 1013 (9th Cir. 2001), the plaintiff sought relief for events

22  outside the limitations period by relying on the continuing violations doctrine. 260 F.3d at 1009.

23  Plaintiff was notified the California Department of Corrections ("CDC") was withdrawing her legal

24  mail and visitation privileges at all CDC facilities.  Plaintiff argued that each time she is denied

25  access to one of her clients housed in a CDC facility, a new cause of action arose under the

26  continuing violation theory.  The *Knox* court held that the continuing violations doctrine was

27  inapplicable because the plaintiff only suffered a continuing impact from an event that occurred

28  outside the limitations period. "[M]ere continuing impact from past violations is not actionable." *Id.*

1   at 1013.

2       The original adoption of the MTSA, which excluded the plaintiff neighborhoods, in 1983 and

3   in 1996 was the alleged unlawful act.  The continual "renewing" of the MTSA does not alter the

4   original act which plaintiffs alleged was discriminatory.  The continual "renewing" has continual ill

5   effects or impacts, as plaintiffs allege, of "chilling" their annexation effects.  Thus, the continuing

6   impact from an alleged past violation is not actionable.  Plaintiffs MTSA claims are barred by the

7   statute of limitations.

8   **E.     State FEHA Claims**

9       **1.  Count 3**

10      Defendants argue that Plaintiffs' Count 3 alleging discrimination in violation of the

11  California Fair Employment and Housing Act ("FEHA"), Government Code Section 12955(l)

12  ("Section 12955(l)") fails as a matter of law.  Section 12955(l) prohibits discrimination in "land use

13  practices...that make housing opportunities unavailable."  Previously, Plaintiffs' Fair Housing Act

14  ("FHA") claims were dismissed twice, because those claims required proof of discrimination in the

15  sale or rental of housing which was not alleged, and was not applicable to already acquired housing.

16  See Coyle Order, pp. 16-25;[10] Beck Order, pp. 10-13[11].  A similar analysis applies here.  The alleged

17  acts do not make housing opportunities unavailable to Plaintiffs, as they already rent or own their

18  homes.  See *Moua v. City of Chico*, 324 F. Supp. 2d 1132, 1141-43 (E.D. Cal. 2004).  Plaintiffs do

19  not present evidence that the Defendants have in any way made housing opportunities unavailable.

20  Plaintiffs do not oppose this motion in their opposition to Defendants' motion for summary

21  judgment.  Therefore, Defendant's motion for summary judgement on Count 3 will be granted.

22      **2.  Count 4**

23      Plaintiffs' Count 4 claim alleges a violation of Cal. Gov. Code Section 11135 ("Section 11135").

24  Section 11135(a) reads:

25          No person in the State of California shall, on the basis of race, national
            origin, ethnic group identification, religion, age, sex, sexual orientation,

26  

27      [10]Order of December 30, 2004.

28      [11]Order of December 29, 2006 (Doc. 177).

24

1
2
3

> color, or disability, be unlawfully denied full and equal access to the
> benefits of, or be unlawfully subjected to discrimination under, any
> program or activity that is conducted, operated, or administered by the
> state or by any state agency, is funded directly by the state, or receives
> any financial assistance from the state.

4   Plaintiffs rely on  a "disparate impact" theory to prove that they have been unlawfully denied full and

5   equal access to benefits on the basis of race, in violation of Section 11135.  Defendants also claim that

6   the state law claims of FEHA violations are time barred under California's stricter discovery rule.

7   Finally, Defendants ask that the state claims be remanded to state court.

8       **(a) Disparate Impact**

9       A disparate impact claim challenges 'employment practices that are facially neutral in their

10  treatment of different groups but that in fact fall more harshly on one group than another and cannot

11  be justified by business necessity.'"*Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477, 1480, 1424

12  (9th Cir. 1987)(en banc) (quoting *Teamster*, 431 U.S. at 336 n. 15), *cert. denied*, 485 U.S. 989, 108

13  S. Ct. 1293, 99 L. Ed. 2d 503 (1988). Illicit motive or intent "is irrelevant because impact analysis is

14  designed to implement Congressional concern with 'the consequences of employment practices, not

15  simply the motivation.'" *Id.* (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 28 L. Ed. 2d

16  158, 91 S. Ct. 849 (1971)).

17      To prevail on a disparate impact theory, plaintiffs must present a prima facie case, which

18  consists of "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse

19  or disproportionate impact on persons of a particular type produced by the [Defendants'] facially

20  neutral acts or practices." *Gamble v. City of Escondido*, 104 F.3d 300, 306 (9th Cir. 1997) (quoting

21  *Pfaff v. U.S. Dep't of Housing & Urban Dev.*, 88 F.3d 739, 745 (9th Cir. 1996) (cited in *Moua,* 324 F.

22  Supp. 1132, 1142).[12]  "If plaintiffs establish a prima facie case of disparate impact, the burden of

23  _____

24      [12]In applying the provisions of the FEHA, California courts often follow decisions construing federal antidiscrimination statutes, as long as those decisions provide appropriate guidance. *Camp v. Jeffer, Mangels, Butler &*

25  *Marmaro* (1995) 35 Cal. App. 4th 620, 635 [41 Cal. Rptr. 2d 329; *Sada v. Robert F. Kennedy Med. Ctr.*, 56 Cal. App. 4th 138; *Walker v. City of Lakewood*, 272 F.3d 1114 .  The Federal Fair Housing Act can be proven by disparate impact. *Keith*

26  *v. Volpe*, 858 F.2d 467, 482 (9th Cir. 1988) (To establish a prima facie case of withholding of housing for an unlawful reason under the Act, a plaintiff must show at least that the defendant's actions had a discriminatory effect).  Where state courts have

27  not determined state law, federal court must make reasonable interpretation thereof. *Molsbergen*, 757 F.2d at 1020.  *Keith*

28  *v. Volpe*, 858 F.2d 467 (By proving a claim under FHA, plaintiffs also established a violation under FEHA).

1   production then shifts to defendants 'to articulate some legitimate, nondiscriminatory reason for the

2   action.'" *Moua*, 324 F.Supp, 1132, 1142, quoting *Harris*, 183 F.3d at 1051.  "If defendants rebut

3   plaintiffs' prima facie case with such a legitimate, nondiscriminatory reason, then the burden shifts

4   back to the plaintiffs to at least raise a genuine factual question as to whether this reason is

5   pretextual." *Id.*

6   _____In order to establish a prima facie case, plaintiffs must "prove the discriminatory impact at

7   issue; raising an inference of discriminatory impact is insufficient." *Gamble*, 104 F.3d 300, 306

8   (quoting *Pfaff*, 88 F.3d at 745).  The focus in a disparate impact case is usually "on statistical

9   disparities, rather than specific incidents, and on competing explanations for those disparities."

10   *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 S. Ct. 2777, 2784-85, 101 L. Ed. 2d 827

11   (1988).  "The point of the statistical evidence is to establish whether Defendant's specific [] action

12   impacted members of a protect grouped more than non-members."  *Beale v. GTE California*, 999 F.

13   Supp. 1312, 1324 (C.D. Cal. 1996).  Accordingly, Plaintiffs may prove causation by offering

14   "statistical evidence of a kind and degree sufficient to show that the practice in question has caused

15   the [plaintiffs alleged harm] because of their membership in a protected group." *Rose v. Wells Fargo*

16   *& Co.,* 902 F.2d 1417, 1424 (9th Cir. 1990).  The Ninth Circuit has warned district courts not to base

17   a disparate impact finding on a statistical sample that is too small.  See *Shutt v. Sandoz Crop*

18   *Protection Corp*., 944 F.2d 1431, 1433 (9th Cir. 1991), cert. denied, 503 U.S. 937, 112 S.Ct. 1477

19   (1992).  The statistical disparities "must be sufficiently substantial that they raise such an inference

20   of causation." Rose, 902 F.2d 1417, 1424 (quoting Watson v. Fort Worth Bank & Trust, 487 U.S.

21   977, 108 S.Ct. 2777, 2784-85 (1988).  The "significance" or "substantiality" of numerical disparities

22   is judged on a case by case basis. *Id.*

23   In *Keith v. Volpe*, 858 F.2d 467 (9th Cir. 1988), a city refused to approve housing

24   development for low and moderate income persons for those displaced by a freeway project. The

25   Ninth Circuit upheld a district court's finding that had discriminatory effect in violation of Fair

26   Housing Act was based on appropriate population of current city freeway displacees and thus the

27   population was valid.  The city had argued that the population evaluated should have included all

28   persons eligible to reside in housing project regardless of whether they were city residents or

26

1   displaced by freeway construction.  The Court found the narrower population was appropriate under

2   the facts of the case. The Court cited the District Court's finding that the failure to build the projects

3   had twice the adverse impact on minorities as it had on whites, because two-thirds of the low-income

4   displacees who would benefit from the project were minorities.

5          In the instant case, the evidence submitted by the plaintiff of the disparate impact relates to

6   the Latino population of the impacted neighborhoods.  Eight island neighborhoods are specifically

7   excepted from the MTSA. In 1996, eight island neighborhoods are specifically excepted from the

8   MTSA, including Bret Harte (76% Latino), Hatch-Midway (74% Latino) and Robertson Road (70%

9   Latino). (Doc. 300, Defendants' Joint Response Fact 11.).  *Keith v. Volpe* permitted the use of a

10  more limited population for disparate impact proof. Under disparate impact theory of proof, the

11  Court cannot conclude as a matter of law, that a reasonable jury would be unable to find disparate

12  impact.  Accordingly, the motion for summary judgment on the state claim under Cal. Gov. Code

13  Section 11135 would be denied.  However, the court finds it barred by the statute of limitations.

14         **(b) Time Bar**

15         Under the California discovery rule, claims accrue when a plaintiff suspects someone has

16  done something wrong to him.  *Jolly v. Eli Lilly Co.*, 44 Cal.3d 1103, 1110 (1988); *Grisham v.*

17  *Philip Morris U.S.A.*, Inc., 40 Cal. 4th 623, 634 (2007).   The "limitations period begins once the

18  plaintiff has notice or information of circumstances to put a reasonable person *on inquiry*." *Jolly*, 44

19  Cal. 3d 1103, 1110-11) (internal citations omitted) (emphasis in original).  On this issue, the

20  California Supreme Court has held,

21          A plaintiff need not be aware of the specific "facts" necessary to establish the claim;
           that is a process contemplated by pretrial discovery.  Once the plaintiff has a
22         suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether
           to file suit or sit on her rights.  So long as a suspicion exists, it is clear that the
23         plaintiff must go find the facts; she cannot wait for the facts to find her. *Id.*

24  Thus, under California's discovery rule, "suspicion of one or more of the elements of a cause of

25  action, coupled with knowledge of any remaining elements, will generally trigger the statute of

26  limitations period." *Grisham*, 40 Cal. 4th 623, 634 (quoting *Fox v. Ethicon Endo-Surgery, Inc.*, 35

27  Cal. 4th 79, 806-807 (2005)).

28         Defendants claim that Plaintiffs had reason to "suspect" they had claims prior to January 1,

27

2002 as to sewers, the MTSA exceptions and the 1998 infrastructure requirement.  Def. Mot.

Summary Judgment, p. 29.  Defendants further argue that Plaintiffs had reason to suspect that they

had claims prior to August 18, 2002 as to the Measure M exceptions and  had reason to suspect they

had claims prior to October 27, 2004 as to their October 27, 2006 MTSA claim.  *Id.*  Defendants,

however,  do not provide the court with the appropriate statute of limitations.  Cal. Gov. Code

Section 12989.1 states

> An aggrieved person may commence a civil action in an appropriate court not later
> than two years after the occurrence or the termination of an alleged discriminatory
> housing practice, or the breach of a conciliation agreement entered into, whichever
> occurs last, to obtain appropriate relief with respect to the discriminatory housing
> practice or breach.

Plaintiffs did not specifically argue against the statute of limitations, other than the arguments

on the "continuing violations" theory, as discussed *infra*.  The Court has rejected theories as not

applicable to the instant case.  Since the "discovery rule" is a stricter standard, and plaintiffs have not

presented evidence of their discovery of their claims, the Court will grant summary judgment on this

claim.

## CONCLUSION

For the foregoing reasons, as to the City and the County, the Court orders as follows:

1.     The Court GRANTS the motion as to claims for violation of Equal Protection and

Title VI of the Civil Rights Act of 1962, on the MTSA allegations.

2.     The Court GRANTS the motion as to the violation of the California Fair Employment

and Housing Act, Govt.Code §12955, on the MTSA allegations.

3.     The Court GRANTS the motion as to the violation of California Govt Code §11135,

on the MTSA allegation.

4.     The Court GRANTS the motion as claims for discriminatory annexation.


IT IS SO ORDERED.

**Dated:     May 16, 2007**                         **/s/ Lawrence J. O'Neill**
                                                    UNITED STATES DISTRICT JUDGE