IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE COMMITTEE CONCERNING COMMUNITY IMPROVEMENT, et al, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF MODESTO, et al, <br><br> Defendants. <br> _____/ | CASE NO. CV-F-04-6121 LJO DLB <br><br> **ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE SUMMARY ADJUDICATION ON SEWERS** |

## I. Introduction

This is an action for declaratory and injunctive relief by plaintiffs seeking to "end the severe harm to their health, safety and dignity caused by Defendants' unlawful discrimination based on race, ethnicity, color, ancestry, or national origin." Third Amended Complaint ("TAC") ¶ 1. Plaintiffs are individual residents of predominantly Latino neighborhoods in unincorporated areas of Stanislaus County and two community groups representing their interests–the Committee Concerning Community Improvement and South United Neighbors. Defendants are the City of Modesto ("City" or "Modesto"), the County of Stanislaus ("County") and the Stanislaus County Sheriff ("Sheriff"). In this motion, the City seeks summary judgment on Plaintiffs' claim that the City has deprived them of sewer services in violation of the Equal Protection Clause of the 14th Amendment, Title VI of the Civil Rights Act of 1962 (42 U.S.C.§ 200d), and the California Fair Employment and Housing Act. For the following reasons, the City's motion for Summary Judgment is GRANTED.

## II. BACKGROUND

The Stanislaus County Local Agency Formation Commission ("LAFCO") approved a sphere of influence[1] for the City of Modesto in 1984. Modesto's sphere of influence ("SOI") consists of 26 unincorporated County islands partly or wholly surrounded by City incorporated territory and other unincorporated areas. The SOI contains 28,451 people, 55% of whom are Latino. (SOI demographics, Mc.D. Decl., Ex. D). Of the 26 unincorporated islands, ten[2] are majority white and the rest are either majority or equal Latino or minority. (Galvez Decl. ¶¶ 5-7, Ex.A). As of the 2000 census, the 26 unincorporated County islands were 61.5% Latino. (Mc.D. Decl. ¶ 24, Ex. W) The individual Plaintiffs reside in four unincorporated County islands within the City's SOI, formally and informally known as "Bret Harte," "Rouse-Colorado" (also known as "the Garden"), "Hatch-Midway" (also known as "No Man's Land") and "Robertson Road."

Plaintiffs allege that these Latino neighborhoods receive fewer and poorer public services than other neighborhoods in Modesto with predominantly white populations. The complaint alleges that because of discriminatory practices, Plaintiffs' neighborhoods lack sidewalks and street lights (TAC ¶38-41), lack effective law enforcement (TAC ¶¶42-43), lack bilingual services (TAC ¶¶44-45), have inadequate storm drainage and sewage disposal (TAC ¶¶46-50), and are used as dumping grounds (TAC ¶¶51-52).

The Third Amended Complaint, filed on February 16, 2007, alleges the City violated plaintiff's rights by[3]:

> (1) denial of Equal Protection and Civil Rights (42 U.S.C. §1983) based on Defendants' denial of services that are available to others in the City

---

[1] A sphere of influence is defined as "a plan for the probable physical boundaries and service area of a local agency." *Placer County Local Agency Formation Com'n v. Nevada County Local Agency Formation Com'n,* 135 Cal.App.4th 793, 806,(Cal.App. 3 Dist.,2006), citing Govt. Code 56076. "A sphere of influence is a flexible planning and study tool to be reviewed and amended periodically as appropriate." *City of Agoura Hills v. Local Agency Formation Com.,* 198 Cal.App.3d 480, 490 (1988).

[2] Defendant City of Modesto ("City") contends that nine unincorporated islands, rather than ten, are majority white. The dispute is over an island named "Scenic Claus." This dispute is immaterial to the instant claim.

[3] As indicated above, the Third Amended Complaint ("TAC") further alleges other violations not pertinent to the instant motion.

>     in a way that intentionally discriminates against Plaintiffs on the basis of race, ethnicity etc. (¶70);
>     (2) violation of Title VI of the Civil Rights Act of 1962, 42 U.S.C. § 2000d and 42 U.S.C. §1983 based on the City of federal funds in providing services in a discriminatory manner (¶74);
>     (3) violation of the California Fair Employment and Housing Act, Govt.Code §12955(l) based on Defendants' use of public land use practices in providing pubic services (¶77); and
>     (4) violation of California Govt Code §11135 and 22 CFR §98000-98413 based on Defendants' use of State funds in providing services in a discriminatory manner (¶80-81)

**A.     Measure A, Measure M advisory votes and Measure M Policy**

In 1979, City voters passed a citizens initiative known as the Modesto Citizens Advisory Growth Management Act or "Measure A." This initiative prohibited the City Council from authorizing any sewer trunk extensions to unincorporated territory without first holding an advisory election. (Britton Decl., ¶3 Ex. A). In 1997, City voters passed another citizens' initiative known as the Modesto Citizens Advisory Growth Management Act of 1995 or "Measure M." This initiative extended the requirement of an advisory election to all sewer improvements in unincorporated areas. Measure M's stated purpose is "to ensure the voters have a direct voice in City decisions concerning whether to allow expansion of urban development." (Brosnahan Decl. Ex. WW). Measure M exempted developments previously subject to a Measure A election from the advisory vote requirement. It also exempted existing sewer facilities, sewer improvements to serve not more than 5 dwelling units or less than 5 acres, and developments consisting solely of non-residential uses. *Id.*    In 1998, the City Council approved a resolution adopting a policy to implement Measure M. (Modesto City Council Resolution No. 98-411). According to the "Policy to Implement the Modesto Citizens' Advisory Growth Management Act of 1995 (Measure M) ("Measure M Policy") adopted by the City Council in 1998, "Before the City Council approves, authorizes, or appropriates funds for sewer improvements to any development project...an advisory election shall be held at the City's sole discretion, as provided for in Measure M." (Brosnahan Decl., Ex. WW). The Measure M Policy further contains the following requirements before the City will, *in its discretion*, hold an advisory election:

<u>The most substantial[4] Infill Areas will not be scheduled until negotiations with the County regarding fiscal issues are complete.</u>  There needs to be significant preparation in advance of scheduling Measure M votes for Infill Areas. A successful Measure M vote may lead to public expectations that annexation will immediately follow, with corresponding expectations that existing deficient infrastructure will be upgraded. Therefore, the fiscal impacts of serving unincorporated areas may vary from area to area, irrespective of whether the City/County property tax agreement is in effect for those areas. The impacts of tax increment financing through the Redevelopment Agency should also be examined.

***

<u>The City will schedule a Comprehensive Measure "M" vote for the most substantial Infill Areas or logical groupings of such Areas.</u> Since urban services are generally available or nearby...and the "urban pattern" is fundamentally established, this approach provides significant time savings toward the ultimate annexation of all Infill Areas.

***

"Infill Areas" which are not "substantial": The City Council, at its sole discretion, may determine that certain Infill areas are not "substantial," and therefore, would not need to be dependent on negotiations with the County. (Underline in original).

Measure A, Measure M, and the Measure M Policy apply to the City's entire SOI, including the 26 unincorporated islands.[5]

**B.  Measure M votes authorized**

There have been six (6) unincorporated islands partly or wholly surrounded by the City incorporated territory that have received advisory Measure M votes: Rosemore-Cox, Carpenter-Shaddox, Emerald Elm, North Briggs, Shackelford, and Robertson Road.

    **1.  "Insubstantial" infills**

In 1999, the City Council deemed two islands to be "insubstantial" and approved them for Measure M votes without further negotiations with the County–Rosemore-Cox (71% White, 28% Latino) and Carpenter-Shaddox (68% White, 30% Latino). These two islands were deemed "insubstantial," because they were under 75 acres and completely surrounded by the City. In 2001, the City Council approved Measure M votes on islands that met the criteria of 75 acres or less and

---

[4] The term "substantial" is not defined in the policy and is left to the "sole discretion" of the City Council (Brosnahan Decl., Ex. WW).

[5] Plaintiffs contend that Measure M Policy's requirement for an infrastructure agreement applies only to islands, not to unincorporated areas. Johnson Suppl. Report, p.4 (Brosnahan Decl., Ex. S).

4

completely surrounded by the City. After the Measure M vote, the resolution listed only two of the three eligible islands. These islands were Emerald Elm (59% White, 31% Latino) and North Briggs (72% Latino). The four islands deemed "insubstantial" have 818 people combined, 58% of whom are Anglo.

The island of Maze-Spencer, the island with the largest number of Latino residents, also fit the definition of "insubstantial" informally adopted by the City Council, but was not granted a Measure M vote. Maze-Spencer is 56% Latino and approximately 78% minority in 2000.

### 2. Robertson Road and Shackleford

Public Improvement Agreements were signed with the County prior to Measure M elections for the Robertson Road, a Plaintiff unincorporated island, and Shackleford, an incorporated island in Southwest Modesto that is predominantly Latino. The Public Improvement Agreement for Robertson Road requires the County to complete infrastructure upgrades after the City extends sewer service to Robertson Road. (Britton Decl., ¶ 25; Mc.D. Decl, Ex. G). Pursuant to the Public Improvement Agreements, and in its discretion, the City approved a Measure M vote for Robertson Road in November 2003 and Shackleford in November 2004. Both received positive Measure M votes.

A breakdown of the statistics for the six neighborhoods receiving Measure M votes is below:

**Islands with Measure M Votes**

|   |   | Acreage | | Total Pop. | Anglo Pop. | Anglo % | Latino Pop. | Latino % |
|---|---|---|---|---|---|---|---|---|
| 1. | Rosemore | (2) | 13.3 | 167 | 119 | 71 | 47 | 28 |
| 2. | Carpenter | (3) | 38.4 | 205 | 138 | 68 | 62 | 30 |
| 3. | Emerald | (6) | 42.8 | 346 | 202 | 59 | 108 | 31 |
| 4. | Briggs | (8) | 13.7 | 100 | 16 | 16 | 72 | 72 |
| 5. | Shackleford | (26) | 208.3 | 2,048 | 371 | 18 | 1,607 | 78 |
| 6. | Robertson Road | (16) | 96.8 | 1,459 | 299 | 20 | 1,021 | 71 |
|   |   |   |   | 4,325 | 1,145 | 26.47 | 2,917 | 67.44 |

**C.    Pelandale-McHenry CPD and EL Vista No. 4**

El Vista No. 4, a non-island area (which did not receive County funding) sought sewer service from Modesto in 1986, before Measure M was in place. The City offered to arrange financing for sewer improvements required by individual landowners and excepted the neighborhood from other infrastructure requirements.[6] Ultimately, an improvement district was created that taxed residents for infrastructure. Second Osner Decl. ¶ 5. Thus, the residents of El Vista No. 4 funded the improvements themselves through this tax scheme. El Vista No. 4 was only 17% Latino as of the 1990 Census.

Pelandale-McHenry CPD contained a large mobile home community that was on septic tanks in 1999. Pelandale-McHenry CPD was approximately 95% White in 1999. The City held a Measure M vote for the Pelandale-McHenry CPD in 1999 without an infrastructure condition, as described more fully below. Pelandale-McHenry is not an island community.

**D.    Plaintiff Neighborhoods**

The four neighborhoods in which Plaintiffs reside were residential developments originally built in the 1940s and 1950s. In 1980, the four neighborhoods were majority Anglo. By 1990, Bret Harte and Hatch-Midway were majority Latino, while Robertson Road and Rouse-Colorado were still majority Anglo. In the census of 2000, all neighborhoods were majority Latino. Of the four neighborhoods in which Plaintiffs reside: (1) Bret Harte has sewer[7]; (2) Robertson Road was approved for sewer; (3) Rouse-Colorado is covered by the Master Tax Sharing Agreement ("MTSA)[8]; and (4) no property tax sharing agreement exists regarding Hatch-Midway. Two plaintiffs residing in Rouse-Colorado–David Cano and Salvador Martinez Gutierrez–have access to the City's sewer system.[9]

---

[6] Plaintiffs and Defendants dispute to what extent the City assisted El Vista No. 4. Because El Vista was not an island area, was not covered by the County, was not granted monetary assistance by the City for improvements, and provided for improvements through resident taxation, El Vista No. 4 is sufficiently distinguishable from the Plaintiff neighborhoods. Therefore, any dispute is immaterial to this motion.

[7] Statement of Undisputed Facts 9-11.

[8] The Court explains in great detail and rules on the Master Tax Share Agreement in "Order on Defendants' Motions for Summary Judgment or In the Alternative Summary Adjudication" (Doc. 329).

[9] On a limited basis, the City has a policy of approving individual sewer extensions to residents next to city sewer pipes running through unincorporated areas, for those willing to pay for it and who agreed to be annexed on the City's request. SUF 12. Numerous residents, including Latinos, in unincorporated areas have obtained individual sewer extensions, including

6

Septic systems in Rouse-Colorado and Hatch-Midway are failing, causing untreated sewage to be released into the groundwater or to the surface due to population density, soil condition, and the age of the septic systems in these neighborhoods. The County has stated that installing sewer in neighborhoods such as Rouse-Colorado and Hatch-Midway is the County's most important infrastructure need.

**D.     The City's "Infrastructure Condition" and the County Policy/Implementation**

For some of the unincorporated islands, the City has imposed a precondition on a Measure M vote.  For these areas, the City will not allow a Measure M vote unless the County agrees to install all non-sewer infrastructure, including storm drains, curbs and gutters, sidewalks, street lighting, and streets, to City standards ("infrastructure condition").  (Brosnahan Decl., Ex. J).  The infrastructure condition was applied to the Shackleford (78% Latino, 2000) and Robertson Road (70% Latino, 2000) neighborhoods.

As applied to the Shackelford Redevelopment Area, which includes Hatch-Midway, the County considered installation of sewer and above-ground infrastructure for the entire area.  The County ultimately determined that it could not afford to complete all of the infrastructure needs of the entire area.  Due to these restraints, the County postponed the installation of sewer in Hatch-Midway and opted instead to install sewer and above-ground infrastructure in the portion of Shackleford north of Hatch Road.  Thus, Hatch-Midway did not receive any above-ground or under-ground improvements, including sewer.  That agreement further requires "[a]s near as possible after completion of sewer improvement in [Robertson Road], COUNTY shall improve all existing public improvements, or construct new public improvements, to fully comply with all requirements of the Modesto Municipal Code and all current City standards." (Bros. Decl, Ex. H).

As applied to Robertson Road, the County did not have the funds needed to build full infrastructure for both above- and underground improvements when the Measure M vote was taken in 2003.  The City made a qualified exception to the infrastructure condition for Robertson Road in 2004,

---

residents of the plaintiff Latino unincorporated neighborhoods, including Plaintiffs Cano and Guitierrez. City also argues that those Plaintiffs lack standing to assert a sewer claim. The Court does not reach the merits of that motion, having decided this question on substantive grounds.

7

because of the severity of the public health crisis in Robertson Road. Accordingly, the City and the County entered into a Public Improvement Agreement that required the County to proceed only with sewer infrastructure in 2004.

In March 2004, the County adopted a policy calling for the construction of underground improvements throughout the County before any neighborhood will get underground improvements. (Brosnahan Decl., Ex. L). In contradiction to the City's infrastructure requirement for these neighborhoods, the County favors a phased approach that addresses the more urgent needs of sewer and drainage first, postponing construction of above-ground infrastructure Sewer Provision.

### D. Procedural History

On April 6, 2005, Plaintiffs filed their First Amended Complaint ("FAC"). By stipulation, Plaintiffs withdrew the FAC and filed a Second Amended Complaint ("SAC") on May 24, 2005. The SAC does not contain a Fair Housing Act claim, a discriminatory annexation claim, or a claim that the City is obligated to provide the same services to unincorporated areas that it provides to incorporated areas. Plaintiffs' remaining claims were framed as discrimination in the provision of voluntary municipal services in White unincorporated areas compared to Latino unincorporated areas. The parties subsequently entered into an Agreement ("the Agreement") on August 31, 2005, limiting Plaintiffs' case to three services voluntarily provided to unincorporated areas sewers, police service and bilingual assistance in police service.

Thereafter, Plaintiffs sought leave to file a Third Amended complaint, to among other things, clarify failure to provide municipal services in a non-discriminatory manner, including through the addition of details concerning the City's implementation of its "Measure M" policy, the City and County's failure to provide infrastructure in the Plaintiff Neighborhoods, and the role played by the exclusion of the Plaintiff Neighborhoods from the "Master Tax Sharing Agreement." The Honorable Dennis L. Beck permitted the filing of the Third Amended Complaint to make these allegations.[10]

///

///

---

[10] For a more detailed procedural history, see MTSA Order.

### III. DISCUSSION

**A.     Summary Judgment Standard**

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact." F.R.Civ.P. 56( c); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467 (1962); *Jung v. FMC Corp.*, 755 F.2d 708, 710 (9th Cir. 1985); *Loeh v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984). The criteria of "genuineness" and "materiality" are distinct requirements. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The requirement that an issue be "genuine" relates to the quantum of evidence the plaintiff must produce to defeat the defendant's summary judgment motion. There must be sufficient evidence "that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

"As to materiality, the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial," and in such circumstances, summary judgment should be granted "so long as whatever is before the . . . court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56 ©, is satisfied." *Celotex Corp. v. Catarett*, 477 U.S. 317, 322 (1986). "If the party moving for summary judgment meets its initial burden of identifying for the court those portions of the material on file that it believes demonstrates the absence of any genuine issues of material fact," the burden of production shifts and the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quoting F.R.Civ.P. 56(e)).

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968) *T.W. Elec. Serv.*, 809 F.2d at 631. The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted). The

9

opposing party's evidence is to be believed and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255; *Matasushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B.      Equal Protection Clause and Civil Rights**

Plaintiffs filed a civil rights claim pursuant to 42 U.S.C. § 1983 ("Section 1983"), alleging a violation of the Equal Protection Clause of the Fourteenth Amendment. 42 U.S.C. § 1983 "creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights." *Squaw Valley Development Co. v. Goldberg*, 375 F.3d 936, 943 (9th Cir. 2004). "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040 (1976) (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954)).

To state a viable Equal Protection claim under Section 1983, "a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir.2001) (citations omitted). Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. *City of Cuyahoga Falls, Ohio v. Buckeye Community Hope Foundation*, 538 U.S. 188, 194, 123 S.Ct. 1389, 1394 (2003). Thus, proof of discriminatory intent is required to show that state action having a disparate impact violates the Equal Protection Clause. *See Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

Plaintiffs point to three categories of evidence which they contend establishes a prima facie claim intentional discrimination based on race. First, Plaintiffs contend that the City's imposition of the infrastructure condition as a prerequisite to a Measure M vote is discriminatory as applied, because the City only imposes the condition on Latinos. Second, Plaintiffs argue that the history of prior Measure M votes give rise to an inference of intentional discrimination against Latinos. The evidence that the City imposed the infrastructure condition on predominately Latino neighborhoods like Robertson Road and Shackleford, but not predominately White neighborhoods like Rosemore-Cox, Carpenter-Shaddox, Emerald-Elm, Grecian-McHenry and Pelandale-McHenry, gives rise to an inference of discriminatory intent. Plaintiffs contend that the City cites statistics from the 1990 census to argue that at the time of

Measure M policy was adopted in 1998, the 26 county islands were not majority Latino and therefore Measure M did not become discriminatory because the "demographics changed." The census statistic from 1990 and 2000, confirm that the composition of the islands at the time Measure M was adopted in 1998 is, at the very least, an unresolved material question of fact that would preclude granting summary judgment. The City has unbridled discretion to impose the infrastructure condition. The infrastructure condition was imposed on Shackleford in 2003, 78% Latino and was imposed on Robertson Road in 2003 when the composition of the neighborhood was 70% Latino. The City has not cited case law to support its claim that, as a matter of law, discriminatory intent can not be inferred where the discrimination at issue affects an area that is less than 50% minority at the time the action is taken.[11]

In its motion for summary judgment, the City contends that three facts prove that Plaintiffs can not establish a prima facie case of discrimination based on race. First, the City provides sewer service or has approved sewer service to only 3 of the 26 unincorporated islands wholly or partly surrounded by the City. SUF 9-11, 32-33. All three of those islands are predominantly Latino. The population of these islands is 76% Latino. By contrast, the City does not provide sewer services to any predominantly Anglo unincorporated islands or areas. SUF 8. Second, the combined population of the six islands receiving Measure M votes is 67% Latino and 74% minority. SUF 35. Third, while Modesto's SOI is 55% Latino as a whole, the portion of the SOI that has sewer or has received an advisory vote is 61% Latino, while the portion of the SOI that does not have sewer or has not received an advisory vote is only 49% Latino. Thus, the City concludes, its sewer and sewer access *favors* Latino unincorporated neighborhoods.

The City further argues that Plaintiffs' sewer claims are quite limited. Two of the four plaintiff neighborhoods already have or are approved for sewer. The only named plaintiffs in the Rouse-Colorado island are already connected to City sewer. Thus, Plaintiffs' sewer claim is limited to one unincorporated County island: Hatch-Midway. Finally, the City argues that the sewer claims are barred

---

[11]Plaintiffs ignore the fact that the burden is on them to prove discriminatory intent to establish a prima facie case.

11

by the statute of limitations.[12]

Plaintiffs seek to prove the invidious discriminatory intent element of a violation of the Equal Protection Clause claim through disparate impact. "Where the challenged governmental policy is 'facially' neutral,' proof of its disproportionate impact on an identifiable group can satisfy the intent requirement only if it tends to show that some invidious or discriminatory purpose underlies the policy." *Lee*, 250 F.3d 668, 686 (citing *Village of Arlington Heights*, 429 U.S. 252, 264-66) (citing *Washington v. Davis*, 426 U.S. 229, 242). "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Washington v. Davis*, 426 U.S. 229, 243. "But our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact.") (emphasis in original). *Id*. at 239. The impact of the official action whether it "bears more heavily on one race than another," may provide an important starting point in the analysis. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. at 264-265, 266.

It is undisputed that Rouse-Colorado and Hatch-Midway need sewers. The existing septic tanks are failing and untreated sewage is backed up. The County acknowledges that installing sewer in these neighborhoods is the County's most important infrastructure need. Further, the infrastructure condition imposed by the City is an impediment or "road block" to the County's efforts to provide sewer service.

Nevertheless, Plaintiffs have failed to prove that the City has intentionally discriminated against them on the basis of race by imposing the infrastructure condition. While Plaintiffs argue that the City has "only" applied the infrastructure condition on Latino islands, the evidence shows Shackleford and Robertson Road were the only "substantial" unincorporated county islands to be considered for a Measure M vote. The other neighborhoods cited by the Plaintiffs are either not unincorporated islands, determined to be "insubstantial" because of their size, or were annexed before Measure M took affect. Therefore, these neighborhoods, and the City's treatment of these neighborhoods is distinguishable from the Plaintiff unincorporated County islands.

---

[12] This Court has twice considered the issue of statute of limitations. See MTSA Order, pp. 20-24.

The City admits that Shackleford and Robertson Road, both predominantly Latino, have been subject to the infrastructure condition. However, the evidence also shows that "No Anglo islands have sewer or been the subject of infrastructure agreements to fund sewer infrastructure." (City Mem at 10:6-7.) Statistically, the combined population of the six island receiving Measure M votes is 67% Latino and 74% minority.

The history of Measure M votes and its application do not prove discriminatory intent. Plaintiffs argue that the vote in 2001 exempting "insubstantial" unincorporated areas from the infrastructure condition proves disparate impact; however, the 2001 vote *benefitted* the predominantly-Latino neighborhood of Briggs. Rosemore-Cox, Carpenter-Shaddox, and Emerald-Elm were exempted from the infrastructure condition, not because these neighborhoods were predominantly Anglo, but because they were 75 acres or less. While it is undisputed that the predominantly-Latino island of Maze-Spencer was excluded, the reason for that exclusion is in dispute. What is clear, however, is that because the predominantly Latino neighborhood of Briggs was benefitted by that action in 2001, without more, Plaintiffs can not prove the type of invidious discriminatory intent against Latinos necessary to establish a prima facie case of an Equal Protection Clause violation. Plaintiffs have not offered any evidence that the City did not impose the infrastructure condition on any "substantial" unincorporated islands that were predominately Anglo after Measure M came into existence or after the Measure M policy. As such, they have not offered proof of an invidious intent or purpose to discriminate against majority-Latino unincorporated County islands within the SOI in Modesto.

Finally, Plaintiffs argue that the comments made by the former mayor show discriminatory intent. Those statements are broad and it is questionable whether they could properly be considered evidence[13]. Also, "[t]he bigoted comments of a few citizens, even those with power, should not invalidate action which in fact has a legitimate basis." *Washington v. Davis*, 426 U.S. at 253.

In sum, Plaintiffs have failed to establish a prima facie case for a violation of the Equal Protection Clause of the Fourteenth Amendment based on the existence and application of the infrastructure condition as a prerequisite to a Measure M advisory vote. The evidence does not show

---

[13] These statements were also considered in a previous order of this Court. See MTSA Order, pp. 19-20.

the discriminatory intent necessary to sustain such a claim. The majority of Plaintiffs have sewer or have been approved by the City to obtain sewer benefits. The neighborhood of Bret Harte already has sewer. Poignantly, 75% of the Plaintiffs, or 3 out of the 4 Plaintiff neighborhoods can not assert a harm based on the infrastructure condition. Two were exempted from the condition and the individually-named Plaintiffs in a third were also granted an exemption by the City. Thus, the experience of Plaintiffs themselves disproves the claim that Latino neighborhoods are being treated in a discriminatory way.

Moreover, in determining discrimination, departures from the normal procedural sequence and the legislative or administrative history are relevant in determining whether official action was taken for an invidious purpose. *Arlington Heights*, 429 at 268. The evidence shows that the City has departed from the practice of imposing the infrastructure condition, to the *benefit* of Latinos. While the City originally imposed the infrastructure condition on Robertson Road, ultimately Robertson Road was approved for sewer services after the City determined that an exemption from the infrastructure condition was necessary in the interest of public health. The only two Plaintiffs representing Rouse-Colorado also have access to sewer, as provided by the City, because of an exemption made for them by the City. Furthermore, the exemption for the "insubstantial" neighborhoods in 2001 also included the predominantly-Latino unincorporated area of Briggs. Plaintiffs do not dispute or refute these facts.[14] Nor do they offer any evidence that a single "substantial" predominantly Anglo island has received any benefit after Measure M was passed.

Plaintiffs do live in poor conditions, including failing septic tanks. The County and the City have put unincorporated County islands in a difficult situation–the County's policy focuses on sewer repair before above-ground improvements, while the City's policy favors an above-ground infrastructure improvement approach before a Measure M advisory vote on sewers. It is undisputed that the City and County policy are at odds. It is further undisputed that most of Rouse-Colorado and Hatch-Midway are in need of new or upgraded sewer systems. Notwithstanding these considerations, the Court does not find evidence of discrimination based on race. Accordingly, Defendant City's motion for partial summary judgment on the Equal Protection relating to the issue of sewers in GRANTED.

---

[14]Plaintiffs do dispute the materiality, relevance or admissibility of these facts.

**C.   Title VI of the Civil Rights Act**

Pursuant to 42 U.S.C. § 2000d, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." As previously discussed by this Court[15], the Supreme Court has held that private parties may not invoke Title VI regulations to obtain redress for disparate-impact discrimination because Title VI prohibits only intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). Because the Court finds no evidence of intentional discrimination in the infrastructure condition and no invidious denial of sewer on the basis of race, the Plaintiff can not sustain a Title VI claim. Accordingly, Defendant City's motion for summary judgment as to sewers on Title VI is GRANTED.

**D.   California Fair Employment and Housing Act**

Plaintiffs' Count 4 claim alleges a violation of Cal. Gov. Code Section 11135 ("Section 11135"). Section 11135(a) reads:

> No person in the State of California shall, on the basis of race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, or disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state.

Plaintiffs rely on a "disparate impact" theory to prove that they have been unlawfully denied full and equal access to benefits on the basis of race, in violation of Section 11135. Defendants claim that Plaintiffs have no material evidence of any disparate impact in the City's voluntary provision of sewer and sewer access to Latino and white unincorporated areas. Defendants also claim that the state law claims of FEHA violations are time barred under California's stricter discovery rule[16]. Finally, Defendants ask that the state claims be remanded to state court.

To prevail on a disparate impact theory, plaintiffs must present a prima facie case, which consists

---

[15] See MTSA Order, p. 20.

[16] This Court has already considered and ruled on the application of the California statute of limitations. See MTSA Order.

of "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the [Defendants'] facially neutral acts or practices." *Gamble v. City of Escondido*, 104 F.3d 300, 306 (9th Cir. 1997) (quoting *Pfaff v. U.S. Dep't of Housing & Urban Dev.*, 88 F.3d 739, 745 (9th Cir. 1996) (cited in *Moua,* 324 F. Supp.2d. 1132, 1142).[17]  "If plaintiffs establish a prima facie case of disparate impact, the burden of production then shifts to defendants 'to articulate some legitimate, nondiscriminatory reason for the action.'" *Moua*, 324 F.Supp.2d. 1132, 1142, quoting *Harris*, 183 F.3d at 1051.  "If defendants rebut plaintiffs' prima facie case with such a legitimate, nondiscriminatory reason, then the burden shifts back to the plaintiffs to at least raise a genuine factual question as to whether this reason is pretextual." *Id.*

In order to establish a prima facie case, plaintiffs must "prove the discriminatory impact at issue; raising an inference of discriminatory impact is insufficient." *Gamble*, 104 F.3d 300, 306 (quoting *Pfaff*, 88 F.3d at 745).  The focus in a disparate impact case is usually "on statistical disparities, rather than specific incidents, and on competing explanations for those disparities." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 S. Ct. 2777, 2784-85, 101 L. Ed. 2d 827 (1988).  "The point of the statistical evidence is to establish whether Defendant's specific [] action impacted members of a protect group more than non-members."  *Beale v. GET California*, 999 F. Supp. 1312, 1324 (C.D. Cal. 1996).  Accordingly, Plaintiffs may prove causation by offering "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the [plaintiff' alleged harm] because of their membership in a protected group." *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1424 (9th Cir. 1990).  The Ninth Circuit has warned district courts not to base a disparate impact finding on a statistical sample that is too small.  See *Shut v. Santas Crop Protection Corp.*, 944 F.2d 1431, 1433 (9th Cir. 1991), *cert. denied*, 503 U.S. 937, 112 S.Ct. 1477 (1992).  The statistical disparities "must be sufficiently substantial

---

[17] In applying the provisions of the FEHA, California courts often follow decisions construing federal antidiscrimination statutes, as long as those decisions provide appropriate guidance. *Camp v. Jeffer, Mangels, Butler & Marmaro*, 35 Cal. App. 4th 620, 635 (1995); *Sada v. Robert F. Kennedy Med. Ctr.*, 56 Cal. App. 4th 138 (Cal. App. 2d Dist. 1997); *Walker v. City of Lakewood*, 272 F.3d 1114 (9th Cir. 2001) . Where state courts have not determined state law, federal court must make reasonable interpretation thereof. *Molsbergen v. United States*, 757 F.2d 1016, 1020 (9th Cir. 1985) . See also, *Keith v. Vole*, 858 F.2d 467 (9th Cir. 1988) (By proving a claim under FHA, plaintiffs also established a violation under FEHA).

that they raise such an inference of causation." *Rose*, 902 F.2d 1417, 1424 (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 S.Ct. 2777, 2784-85 (1988). The "significance" or "substantiality" of numerical disparities is judged on a case by case basis. *Id.*

"A party charged with discrimination may diffuse a prima facie case against him, and hence avoid the need to supply a legally sufficient, nondiscriminatory reason in rebuttal, by successfully challenging the statistical basis of the case." *Pfaff*, 88 F.3d 739, 74l.

For the reasons discussed above, Plaintiffs have not established a disparate impact on majority-Latino unincorporated islands within Modesto's SOI, based on the application of the infrastructure condition. Notably, Plaintiffs never responded to the motion for summary judgment on the California state claims, nor defended them, in any of the numerous filings with this Court. Accordingly, Defendant City's motion for summary judgment as it relates to sewers on the FEHA claim is GRANTED.

## IV. CONCLUSION

For the foregoing reasons, the Court ORDERS:

(A)  City's motion for partial summary judgment on Equal Protection Claim relating to sewers is GRANTED in favor of the City; and

(B)  City's motion for partial summary judgment on Title VI Claim relating to sewers is GRANTED in favor of the City; and

(C)  City's motion for partial summary judgment on FEHA claims as they relate to sewers is GRANTED in favor of the City.

IT IS SO ORDERED.

Dated:   **May 22, 2007**              /s/ Lawrence J. O'Neill
                                              UNITED STATES DISTRICT JUDGE