1
2
3
4
5
6
7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   THE COMMITTEE CONCERNING                    CASE NO. CV-F-04-6121 LJO DLB
     COMMUNITY IMPROVEMENT,
12   SOUTH UNITED NEIGHBORS, DAVID
     CANO, MANUEL ESPINO, HORTENCIA
13   FRANCO, ENA LOPEZ, GRISELDA
     MARTINEZ, SALVADOR GUTIERREZ
14   MARTINEZ, JUAN MERCADO,
     MAGDALENA MERCADO, JUAN
15   PEREZ, GLORIA PIMENTEL, ALFONSO
     RIVERA, and DARREN SHAEFFER,
16
                       Plaintiffs,              **ORDER ON DEFENDANT'S MOTION**
17        vs.                                   **FOR SUMMARY ADJUDICATION ON**
                                                **LAW ENFORCEMENT AND BILINGUAL**
18   CITY OF MODESTO, COUNTY OF                 **SERVICES** (Doc. 312)
     STANISLAUS, and STANISLAUS
19   COUNTY SHERIFF,

20                     Defendants.
     _____/
21

22                              **I. INTRODUCTION**

23        In this motion, Defendants County of Stanislaus ("County") and the Stanislaus County Sheriff

24   ("Sheriff") seek summary adjudication on Plaintiffs' claims that the County and Sheriff have deprived

25   them of equal law enforcement protective services and bilingual services in violation of the Equal

26   Protection Clause of the 14th Amendment and Title VI of the Civil Rights Act of 1962, (42 U.S.C.§

27   2000d and 42 U.S.C. §1983). Plaintiffs base their argument on a theory that the County is jointly and

28   severally liable for the actions of the dispatch agency, because dispatch times are greater in

                                         1

1   predominantly-Latino unincorporated areas of Stanislaus County and discriminatory.  Plaintiffs further

2   argue that the dispatch agency discriminates against Latinos because it lacks sufficient bilingual services.

3   For the following reasons, Defendants' motion for summary adjudication is GRANTED in full.

4

5
                                        **II. BACKGROUND**

6         This is an action for declaratory and injunctive relief by plaintiffs seeking to "end the severe

7   harm to their health, safety and dignity caused by Defendants' unlawful discrimination based on race,

8   ethnicity, color, ancestry, or national origin."  Third Amended Complaint ("TAC") ¶ 1.[1]  Plaintiffs are

9   individual residents of predominantly Latino neighborhoods in unincorporated areas of Stanislaus

10  County and two community groups representing their interests–the Committee Concerning Community

11  Improvement and South United Neighbors.  The individual Plaintiffs reside in four unincorporated

12  County islands within the City's SOI, formally and informally known as "Bret Harte,"

13  "Rouse-Colorado" (also known as "the Garden"), "Hatch-Midway" (also known as "No Man's Land")

14  and "Robertson Road."

15         Plaintiffs allege that these Latino neighborhoods receive fewer and poorer public services than

16  other neighborhoods in Modesto with predominantly white populations.  Pertinent to this motion,

17  Plaintiffs allege that because of discriminatory practices, Plaintiffs' neighborhoods lack effective law

18  enforcement (TAC ¶¶42-43) and bilingual services (TAC ¶¶44-45).  Plaintiffs assert that because they

19  reside in Latino Unincorporated Neighborhoods, they receive inferior, fewer, and poorer public services

20  than some other unincorporated urban areas of Stanislaus County with predominantly White populations.

21  (TAC ¶35).  Plaintiffs allege they are harmed by the alleged discriminatory practice, because the "lack

22  of adequate patrols and by law enforcement and the slow response by law enforcement to emergencies

23  puts the residents of the Latino Unincorporated Neighborhoods at greater risk for criminal activity than

24  predominantly White unincorporated neighborhoods" and  "gives rise to additional health and safety

25  hazards for Plaintiffs' and their children."  (TAC ¶¶ 37, 2 ). "As a result of the lack of adequate law

26

27          [1]This Court has already granted summary adjudication in favor of Defendant County and Defendant City of Modesto
on two separate issues, not pertinent to the instant motion.  (See Docs.329 and 332).  These orders provide broader
28  background of the issues raised by the parties.  Those facts are incorporated herein.

enforcement protection...the few open spaces that exist have become magnets for prostitution and drug use." (TAC 53).

In the Third Amended Complaint, Plaintiffs describe the alleged discriminatory conduct in the following paragraphs:

### 2. Lack of Effective Law Enforcement Protection
42. Despite consistently high crime levels, the Latino Unincorporated Neighborhoods do not receive adequate protection from the Sheriff or Modesto Police. Patrols of the Latino Unincorporated Neighborhoods by law enforcement are too infrequent and law enforcement does not respond sufficiently to calls from residents of the Latino Unincorporated Neighborhoods. The Sheriff's office has at times responded slowly, or in some cases, did not respond at all, to reports of home break-ins or other crimes, even those in progress. As a result of the Sheriff's lack of patrols and lack of response or slow response to calls originating from the Latino Unincorporated Neighborhoods, street crime and property damage are high in these neighborhoods. On information and belief, certain neighborhoods in predominantly White unincorporated urban areas are served by the Modesto Police and the Sheriff under informal joint policing agreements.

43. On information and belief, residents in predominantly White unincorporated areas enjoy more effective crime prevention, a greater law enforcement presence and faster and more frequent responses to emergency calls than residents of the Latino Unincorporated Neighborhoods.

### 3. Lack of Bilingual Services
44. A large proportion of the residents in these Latino Unincorporated Neighborhoods speak Spanish as their first language and do not speak English well. According to the 2000 census, approximately 41% of residents in Rouse-Colorado, 42% of residents in Robertson Road, 46% of residents in Bret Harte, and 38% of residents in Hatch-Midway speak English less than very well.

45. The City and County fail to take appropriate steps to provide alternative communication services in Spanish to the Spanish-speaking residents of the Latino Unincorporated Neighborhoods. On information and belief, too few providers of public services such as sheriffs  and emergency dispatchers speak enough Spanish to provide the meaningful assistance to the residents of these Latino Unincorporated Neighborhoods. The lack of Spanish speaking public safety employees further restricts access for residents of the Latino Unincorporated Neighborhoods who do not speak English well to the emergency police assistance they need.

Plaintiffs allege that these failures by the County and Sheriff resulted in  violations of the Equal Protection Clause of the 14th Amendment, Title VI of the Civil Rights Act of 1962, (42 U.S.C.§ 200d and 42 U.S.C. §1983) and California Government Code §11135 and 22 CCR 98000-98413.  Defendants only move for summary adjudication on the federal claims.  Thus, this Court will not consider the state claims.

///

3

**Consolidated Emergency Dispatch Agency**

Until September 1, 1999, the City and County had an "Emergency Dispatch Agreement." This agreement provided for a Public Safety Central Dispatching System. According to that agreement, the County was the agency responsible for operating, maintaining, and managing the Emergency Dispatch Center on behalf of the participating parties. See Declaration of Brian Brosnahan, Ex. M.

On September 1, 1999, the City and County entered into a "Joint Exercise of Powers Agreement." ("JPA"). This agreement created the Consolidated Emergency Dispatch Agency ("Dispatch Agency"), a "joint powers agency which is separate from the [City and County], as authorized under California law, to provide Dispatch Service." JPA, p.1. The Dispatch Agency is administered by a seven (7) member commission, consisting of: (1) member of the Modesto City Council, (1) member of the County Board of Supervisors, the County Chief Executive Officer, the Modesto City Manager, (2) members of the Dispatch Advisory Board (one from each member agency), and (1) member of a contracting city (an alternating position). JPA, p. 10. The Dispatch Agency also has a Dispatch Advisory Board, which provides "leadership, recommendations on policy; and procedural direction on matters of operational concern." JPA, p. 14. The Dispatch Advisory Board is comprised of the Modesto Fire Chief, Modesto Police Chief, Stanislaus County Fire Warden, and the Stanislaus County Sheriff. *Id.* The Dispatch Advisory Board reviews and makes recommendations on budget and staffing levels. *Id.* These recommendations are delivered to the Commission. According to the agreement, and pursuant to California Gov. Code Section 6508, the Dispatch Agency has the power to sue and be sued in its own name. JPA, p. 5 (4.1.11). The Dispatch Agency provides police and fire emergency dispatch service for 22 law-enforcement and fire agencies in Stanislaus County.

**Pertinent Procedural History**

On December 30, 2004, the Honorable Robert E. Coyle signed an "Order Granting in Part, Granting in Part with Leave to Amend, And Denying in Part Defendants' Motions to Dismiss and Directing the Filing of a First Amended Complaint." (Doc. 49) ("2004 Order"). In that order, among other things, the Court dismissed individually named defendants as well as the Consolidated Emergency Dispatch Agency. In the original complaint, Plaintiffs had only alleged one cause of action against the

Dispatch Agency–violation of the Fair Housing Act, 42 U.S.C. §3604.[2] (2004 Order, p. 16 n.2).  In finding that the "scope of Section 3604(b) [is limited] to discrimination in the provision of services in connection with the acquisition of a dwelling," the Court dismissed the action against the Dispatch Agency.  2004 Order, p. 25.  The Court did not grant leave to amend and the Dispatch Agency was terminated as a defendant on December 30, 2004.  In the 2004 Order, the Court also noted that Consolidated Emergency Dispatch Agency was erroneously sued as Stanislaus Regional 911.  2004 Order, p. 16.

On April 6, 2005, Plaintiffs filed their First Amended Complaint ("FAC").  By stipulation, Plaintiffs withdrew the FAC and filed a Second Amended Complaint ("SAC") on May 24, 2005.  The parties subsequently entered into an Agreement on August 31, 2005, limiting Plaintiffs' case to three services voluntarily provided to unincorporated areas:  sewers, police service and bilingual assistance in police service.

On August 17, 2007, the City of Modesto filed a motion for summary judgment to eliminate Plaintiffs' claims of discrimination in police service and bilingual assistance in police service.  That motion hearing was vacated, as Plaintiffs sought leave to file a Third Amended complaint on October 27, 2006.  On December 27, 2006, the Honorable Dennis L. Beck filed an "Order Denying in Part and Granting in Part Motion for Leave to File Third Amended Complaint." (Doc. 177) ("2006 Order").  In that motion, among other things, Plaintiffs sought to "make explicit their claim that City and County are jointly liable with respect to discrimination concerning law enforcement services and bilingual services thereto, based on the Joint Powers Agreement." (2006 Order, p.4).  Plaintiffs further sought to "make explicit their theory that City and County are jointly liable with respect to all causes of action based upon their deep entwinement and interdependence."  *Id.*  The Court noted that "Plaintiffs based this 'clarification' on the Joint Powers Agreement between the City and County. (2006 Order, p.7).  Finding that Plaintiffs were "aware of the general facts supporting this amendment" since November 2005, the Court denied Plaintiffs' motion to amend the complaint to add facts to make explicit their theory of joint

---

[2]42 U.S.C. §3604 provides that it shall be unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities therewith, because of race, color...or national origin."

liability based on the Joint Powers Agreement. *Id.* In denying Plaintiffs' motion to amend on this joint liability theory, the Court found that "the cases to not, as Plaintiffs argue, suggest that two state actors, as joint participants in public action, could somehow be found jointly and severally liable for their actions." 2006 Order, p. 9. Because the motion involved the City and the County, the Court concluded that those "two independent entities [] actions will not confer joint and severally liability unless the actions of *each* are found to be discriminatory." *Id.(*emphasis in original).

Plaintiffs moved for reconsideration of the 2006 Order.   On February 8, 2007, the Honorable Anthony W. Ishii, among other things, denied Plaintiffs' motion for reconsideration. (Doc. 235) ("2007 Order").   The Court found that the Magistrate Judge's decision to deny Plaintiffs' motion to amend the SAC to more explicitly state its JPA claim would be prejudicial to Defendants is not clearly erroneous." 2007 Order, p. 6.  The Court further ruled that

> the Magistrate Judge has ruled that Plaintiffs are not granted leave to amend the complaint to plead any of the legal theories of joint liability proposed by Plaintiffs in their motion to amend.  The court has found the Magistrate Judge's decisions are not contrary to law.  Plaintiffs' therefore lack a *legal* basis to assert any theory of joint liability that is not currently pled in the SAC, regardless of the proposed factual predicate. (2007 Order, p. 8) (emphasis in original)

Defendants filed this motion for summary adjudication on May 8, 2007.  (Docs. 313-321)  On May 30, 3007, Plaintiffs filed their opposition, with accompanying documents. (Docs. 348-354). Defendants' filed their reply on June 12, 2007. (Docs. 360-365).  On June 16, 2007, Plaintiffs lodged a surreply. (Doc. 377).  Defendants were granted leave to file a sur-surreply, which was filed on June 28, 2007. (Doc. 392).   The Court had read and reviewed all documents presented.

## III. DISCUSSION

### A.    Summary Judgment Standard

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact." F.R.Civ.P. 56( c); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467 (1962); *Jung v. FMC Corp.*, 755 F.2d 708, 710 (9th Cir. 1985); *Loeh v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984).  The criteria of "genuineness" and "materiality" are distinct requirements. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  The requirement that an issue be "genuine" relates to the quantum of evidence the plaintiff must produce to defeat the defendant's summary judgment motion.  There must be sufficient evidence "that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

"As to materiality, the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248.  "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial," and in such circumstances, summary judgment should be granted "so long as whatever is before the . . . court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56 (c), is satisfied." *Celotex Corp. v. Catarett*, 477 U.S. 317, 322 (1986).  "If the party moving for summary judgment meets its initial burden of identifying for the court those portions of the material on file that it believes demonstrates the absence of any genuine issues of material fact," the burden of production shifts and the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quoting F.R.Civ.P. 56(e)).

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First National Bank of Arizona v. Cities Serv. Co*., 391 U.S. 253, 290 (1968) *T.W. Elec. Serv.*, 809 F.2d at 631.  The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).  The opposing party's evidence is to be believed and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  *Anderson*, 477 U.S. at 255; *Matasushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B.       Equal Protection Clause of the Fourteenth Amendment and Civil Rights**

Plaintiffs filed a civil rights claim pursuant to 42 U.S.C. § 1983 ("Section 1983"), alleging a violation of the Equal Protection Clause of the Fourteenth Amendment.  42 U.S.C. § 1983 "creates a private right of action against individuals who, acting under color of state law, violate federal

1  constitutional or statutory rights." *Squaw Valley Development Co. v. Goldberg*, 375 F.3d 936, 943 (9th

2  Cir. 2004). "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the

3  prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229,

4  239, 96 S.Ct. 2040 (1976) (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954)).

5  To state a viable Equal Protection claim under Section 1983, "a plaintiff must show that the

6  defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership

7  in a protected class." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir.2001) (citations omitted);

8  see also *City of Cuyahoga Falls, Ohio v. Buckeye Community Hope Foundation*, 538 U.S. 188, 194, 123

9  S.Ct. 1389, 1394 (2003); *Village of Arlington Heights v. Metropolitan Housing Dev. Corp*., 429 U.S.

10  252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). "Where the challenged governmental policy is 'facially'

11  neutral,' proof of its disproportionate impact on an identifiable group can satisfy the intent requirement

12  only if it tends to show that some invidious or discriminatory purpose underlies the policy." *Lee*, 250

13  F.3d 668, 686 (citing *Village of Arlington Heights*, 429 U.S. 252, 264-66) (citing *Washington v. Davis*,

14  426 U.S. 229, 242). "[A]n invidious discriminatory purpose may often be inferred from the totality of

15  the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than

16  another." *Washington v. Davis*, 426 U.S. 229, 243. "But our cases have not embraced the proposition

17  that a law or other official act, without regard to whether it reflects a racially discriminatory purpose,

18  is unconstitutional *solely* because it has a racially disproportionate impact.") (emphasis in original). *Id.*

19  at 239. The impact of the official action whether it "bears more heavily on one race than another," may

20  provide an important starting point in the analysis. *Village of Arlington Heights v. Metropolitan Housing*

21  *Development Corp.*, 429 U.S. at 264-265, 266.

22  Additionally, the Supreme Court has held that counties, cities, and local officers sued in their

23  official capacities cannot be held vicariously liable under Section 1983 for the actions of subordinate

24  officers (*Monell v. Dept. of Soc. Servs*., 436 U.S. 668, 691 (1978); *City of Canton v. Harris*, 489 U.S.

25  378, 385 (1989)), but that they may be held liable for constitutional violations where "the action that is

26  alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or

27  decision officially adopting that official policy is responsible for the deprivation of rights protected by

28  the Constitution." *Monell*, 436 U.S. 668, 690. Section 1983 "plainly imposes liability on a government

that, under color of some official policy, 'causes' an employee to violate another's constitutional right." *Id.* Thus, "a local government may not be sued under Section 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under Section 1983." *Monell,* 436 U.S. 658, 691.

Thus, a plaintiff must plead and prove: (1) a municipal custom or policy and (2) that this custom or policy was "the cause of and the moving force behind the deprivation of constitutional rights." *Oklahoma City v. Tuttle*, 471 U.S. 808, 819 (1985). In other words, there is no *respondeat superior* liability against a municipality. Plaintiffs may impute conduct to the municipality if the individual committing an alleged wrong is a "policy-maker" within the municipality hierarchy. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124-28 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 489 (1986).

A court reviewing a Section 1983 claim must "identify those officials or government bodies who speak with final policy-making authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *McMillan v. Monroe County*, 520 U.S. 781, 783-84 (1997), citing *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989). If the sheriff's actions constitute county "policy," then the county is liable for them. *McMillan*, 520 U.S. 781, citing *Monell*, 436 U.S. 658, 694.

### 1. Protective Services

The Supreme Court has recognized that "the State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 197 n.2 (1989). The issue presented is whether the County denies adequate protective services to the Latino unincorporated areas because of their race or ethnic origin. The County argues that the Sheriff's assignment of deputies and deputy response time actually *favors* Latino unincorporated neighborhoods, there is no evidence of intentional discrimination, and liability for dispatch times should not be imputed to the County, as they are not within its control. Plaintiffs argue that slower dispatch times prove a discriminatory custom or policy. Plaintiffs then argue that the Sheriff's slow response times coupled with comments made by

1    deputies prove invidious discrimination against the Plaintiff neighborhoods based on race.

2                              **A.  Response Times**

3          In support of this motion, the County presented statistical evidence of its "response time," which

4    is defined as the difference between the time dispatched and the time on scene.  Deposition of Capt. Raul

5    DeLeon ("DeLeon Depo."), attached as Ex. A to Declaration of Terrence Cassidy ("Cassidy Decl."), and

6    Ex. 12 attached thereto.[3]  The data presented represented reporting districts, as designated by the Sheriff

7    and crime analyst.  DeLeon Depo, 86:3-87:16.  The chart lists Plaintiff neighborhoods, Latino

8    Unincorporated Neighborhoods and All Unincorporated Neighborhoods and the response times for each

9    neighborhood to each Priority.  Priorities are designated by the dispatch center.  DeLeon Depo, 87:19.

10   Priority one would be the "hot calls, the felony in progress."  *Id.*

11          According to the report, in 2001, the average response time of all Priorities in Latino

12   Unincorporated Neighborhoods was 8.1 minutes.  The average response time of all Priorities in All

13   Unincorporated Areas, including both Latino and White neighborhoods, was 10.1 minutes.  These

14   response times also favored Latino and Plaintiff neighborhoods in 2002 and 2003.  In 2004, which is the

15   last year for which data was collected, the average response time for a Priority One call in all

16   unincorporated Stanislaus County was 9.5 minutes.  Compare that to a response time of 4.5 minutes for

17   Latino Unincorporated Neighborhoods Total.  The Plaintiff neighborhoods themselves enjoyed response

18   times which were, on average, quicker than both the Latino Unincorporated Neighborhoods Total and

19   the total for All Unincorporated Stanislaus County.  For instance, Bret Harte had a Priority One response

20   time of 3.4 minutes; 3.6 minutes for No Man's Land; 7.5 minutes for Robertson Road; and 5.0 minutes

21   for The Garden.  An average of all Priorities shows an average response time of 8.0 for Bret Harte, 10.6

22   minutes for No Man's Land, 11.5 minutes for Robertson Road, 8.0 minutes for The Garden, 9.5 minutes

23   for Latino Unincorporated Neighborhoods Total, and 11.7 minutes for All Unincorporated Stanislaus

24   County.  Thus, the statistics presented demonstrate that the Latino pocket neighborhoods on average

25   enjoyed response times which were quicker than all unincorporated areas.

26          Plaintiffs do not materially dispute the evidence presented by the County regarding the response

27   _____

28        [3]The Court relies upon these charts presented for the statistics discussed the following two paragraphs.

times of the responding deputies once they receive the directive from dispatch. Rather, they argue that the custom of discrimination is evidenced by the slow dispatch times and argue that the Court should focus on dispatch times only. Plaintiffs contend that the focus on response time is not a meaningful measurement of discrimination when comparing geographically separates areas. Plaintiffs dispute the materiality of the evidence presented by the County, arguing that the more meaningful comparison is of "dispatch times"–the difference between the time the caller places the call and the time the dispatcher notifies the deputy about the reported incident. Evidence presented by Plaintiffs shows that the dispatch times for Latino Unincorporated neighborhoods is slower than other unincorporated areas in the County.

Plaintiffs expert, James H. Johnson Jr. ("Dr. Johnson"), focused his report solely on dispatch times. Declaration of Brian P. Brosnahan ("Brosnahan Decl."), Ex. N. Dr. Johnson offered the following statistical analysis in his supplemental report, at *id*:

### Table A: Dispatch Averages

|  | Jan. 1, 2002 – Aug. 17, 2004 (pre-litigation) | Aug. 18, 2004 – Dec. 31, 2006 (post-litigation) |
| --- | --- | --- |
| Plaintiff Neighborhoods | 18.9 min | 13.3 min |
| ≥60% Latino Islands | 17.7 min | 12.9 min |
| County Minus Plaintiffs | 15.2 min | 11.5 min |
| ≥60% White Islands | 15.2 min | 10.7 min |
| Del Rio (85.3% White) | 6.6 min | 3.0 min |

This report shows that there are differences in the dispatch times between Latino islands and White islands by about 2.5 minutes between 2002-2004 and 1.8 minutes between 2004 and 2006. Plaintiffs rely on these figures to prove that there is a custom by the Dispatch Center, which is imputed to the Sheriff and County, of racial discrimination against Latino unincorporated neighborhoods in Stanislaus County.

### 2. Joint and Several Liability in Section 1983 claims

Defendants argue that the Dispatch Agency is a wholly independent legal entity, neither the County nor the Sheriff's Office has control over the amount of time it may take for the Dispatch Agency to relay the call to the deputy, and thus the County cannot be held liable for the dispatch time that is

totally in the control of the Dispatch Agency.  Def. Mot. Sum. Adj., p.5 n.2.  Moreover, Defendants argue that the Court has previously ruled that there is no claim for joint and several liability against the County or the Sheriff for the actions of the Dispatch Agency.  *Id*, citing 2007 Order, pp. 4-8.  Plaintiffs response is two-fold.  First, Plaintiffs argue that the County is responsible for the Dispatch Agency.  Second, Plaintiffs contend that the 2007 Order does not prohibit the argument that the County is liable for the actions of the Dispatch Agency.  The Dispatch Agency also provides several informative reasons why the dispatch times might vary.  See Declaration of Paul Klein, Doc. 363, pp. 4-6.

First, the Court notes that Plaintiffs incorrectly argue that the County is the agency responsible for the Dispatch Agency.  For this assertion, Plaintiffs cite (in bold) to a statement contained in an agreement between the City and County which expired on September 31, 1999.  The JPA, which replaced and superceded that agreement, differs from the prior agreement in a very significant way.  The JPA created the Dispatch Agency in accordance with Cal. Gov. Code Section 6500 *et seq*.  Through this authority, the City and County created a wholly separate and independent legal entity, which has the right to be sued and to sue in its own capacity.  Under the JPA, the Dispatch Agency is responsible for itself.

Second, the Court notes that the complaint alleges that the Sheriff responds more slowly to Plaintiffs' calls for service, but does not allege that the County is jointly and severally liable for the actions of the Dispatch Agency.  See TAC, ¶¶42, 43. Moreover, while Plaintiffs' expert's report on dispatch times was published before Plaintiffs lodged the TAC, Plaintiffs failed to allege dispatch times in their complaint in relation to protective services.  All facts related to the response of the Sheriff's office only.

Furthermore, although it has the power to sue and be sued under the terms of the JPA and under California law, the Dispatch Agency is not a party to this litigation.  Notably, the Dispatch Agency was a named party until it was dismissed in the 2004 Order.  Plaintiffs did not allege in the original complaint, the first, second or third amended complaints,  a claim of discrimination against the Dispatch Agency in relation to dispatch times.  The report on dispatch times now presented to the Court was published before the third amended complaint was lodged.  In the last amendment to the complaint, they sought to include a claim of joint and several liability between City and County based on the Joint Powers Agreement, which creates the Dispatch Agency.  In denying that motion, both the Magistrate

Judge and District Judge both found that Plaintiffs had unduly delayed that argument which would cause prejudice to Defendants.  See 2006 and 2007 Orders.

Defendants argue that Plaintiffs seek to raise a new claim not previously raised.  In opposition, Plaintiffs argue that Defendants were made aware that the claim was based on dispatch times, because Dr. Johnson's report, dated November 17, 2006, focused on dispatch times.

Defendants incorrectly characterize the 2006 and 2007 Orders as deciding the issue of whether Plaintiffs may assert a claim against the County as jointly and severally liable for the actions of the Dispatch Agency.  The issue presented to the Court in those orders was whether Plaintiffs could assert a theory of joint and several liability between the City and County based on the Joint Powers Agreement. While the Joint Powers Agreement is the instrument which creates the Dispatch Agency, the current issue was not previously raised or decided by the Court.  The reasoning of the 2006 and 2007 Orders, however, is applicable to the present case.  In the 2006 Order, the Court found that,

> the holdings  [of *Burton* and *Brentwood*] make action that would have otherwise been outside the scope of the Fourteenth Amendment into covered state action based on the entwinement of the entities.  The case before this Court involves two independent governmental entities whose actions will not confer joint and several liability unless the actions of each are found to be discriminatory. *Id.* at 9.

Defendants also point to cases which make clear that there is no joint and several liability for Section 1983 claims.  In Monell v. New York City Dept. Of Soc. Servs., 436 U.S. 658, 692 (1978), the Supreme Court found that "Congress did not intent section 1983 liability to attach where causation [by each party] was absent."  "It is only when the municipality itself commits the misdeed...that the government entity is responsible under section 1983." *Walker v. City of New York*, 974 F.2d 293, 296 (2d. Cir. 1992), *cert. denied*, 507 U.S. 961 (1993).

The Court, however, need not reach the joint liability issue presented by the parties.   There is a dispute over the control County and Sheriff have over the Dispatch Agency.  This Court must resolve all ambiguities and draw reasonable inferences in favor of the party defending against the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).  In this motion, the Court must also inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  As explained below, there is no evidence of invidious, intentional discrimination to establish a claim of an Equal Protection violation.

**No invidious intentional discrimination**

"Proof of discriminatory intent is required to show a violation of the Fourteenth Amendment." *Village of Arlington Heights*, 429 U.S. 252, 265 (1977). Thus, Plaintiffs must prove that Defendants acted in a discriminatory manner and that the discrimination was intentional." *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 948 (9th Cir. 2003). Discriminatory purpose "implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker...selected or reaffirmed a particular court of action at least in part because of, 'not merely in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

Direct evidence of discriminatory purpose and intent may be unavailable. In such a situation, the court must make "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. "The court must therefore look to the totality of the relevant evidence to determine whether invidious discriminatory purpose was a motivating factor for the decision." *Id.* The factors court looks upon include (1) the discriminatory effect of the official action, (2) the historical background of the decision, (3) the specific sequence of events leading up to the challenged decision, (4) departure from the normal procedural sequence, (5) departures from the normal substantive [standards], and (6) legislative or administrative history of the decision. *Id.* at 266-68.

Plaintiffs argue that "Dr. Johnson's expert reports set forth incontrovertible evidence of a custom or practice of dispatching patrol cars more quickly to predominantly White neighborhoods than to predominantly Latino neighborhoods." Pl. Opp. Mot. Summary Adj., p. 9. Plaintiffs base the majority of their argument on why the Court should focus on dispatch times rather than response times or total response times. See Pl. Opp. Mot. Summary Adj., pp. 3-14. To demonstrate the effect of the alleged poor protective services, Plaintiffs provide evidence from named-Plaintiffs about the time it took for Sheriff deputies to respond once they called 911. *Id.*, pp. 14.[4] Then, in an effort to address the intent requirement, Plaintiffs assert that "dilatory response times are a product of insensitive and discriminatory attitudes of the Sheriff's Department." *Id.* p. 15. For this proposition, Plaintiffs cite to a statement made

---

[4]Defendants respond by showing that the testimony of those Plaintiffs: (1) fails to demonstrate that those Plaintiffs received service which was different from anyone else and (2) several Plaintiffs acknowledged a quick response.

1  by a Sheriff deputy.  *Id.*

2        To prove their claim, Plaintiffs must establish that a municipal policy existed to provide them

3  with fewer or inferior law enforcement services because they are Latino and that any such policy is the

4  "moving force" behind any such deprivation of constitutional rights.  *Tuttle*, 471 U.S. at 819.  Here,

5  Plaintiffs argued that the difference in dispatch times proves the existence of a discriminatory custom.

6  However, the evidence of impact and intent further demonstrates Plaintiffs' failure to establish a claim

7  of a violation of the Equal Protection Clause.  While Plaintiffs argue extensively on why response times

8  should not be considered, the *impact* of the discriminatory action on the Plaintiffs can only be shown

9  by total response time, which includes the time it takes for the patrol deputies to respond.  Plaintiffs

10  inconsistently and impermissibly ask this Court to ignore response times in an effort to prove the alleged

11  discriminatory custom and then rely on response times in an attempt to prove discriminatory intent.  Put

12  another way, Plaintiffs' argument rests on a theory of imputed liability of the actions of the Dispatch

13  Agency to the Sheriff and County.  Then, Plaintiffs assert that the Sheriffs have discriminatory attitudes,

14  which is meant to support the discriminatory intent of the dispatch agents.  In sum, Plaintiffs have failed

15  to show the custom or policy of the agency and how that custom or policy was motivated by a

16  discriminatory intent of a policy-maker.  Therefore, Defendants' motion for summary adjudication on

17  this issue is GRANTED.

18        **B.  Sheriff Actions**

19        Plaintiffs' complaint alleges that the Sheriff patrols are infrequent and they either are slow to

20  respond or fail to respond.  As discussed above, the data presented shows that the response times of the

21  Sheriff deputies do not demonstrate a longer response time to the Latino unincorporated areas.  In fact,

22  Sheriff deputies respond to those areas quicker.  If the Court were to consider the *total* response times

23  of the Sheriff's deputies as the alleged discriminatory custom, Plaintiffs claim would still fail.  The

24  uncontested evidence shows that there was no discriminatory *effect* in the challenged practice.

25        In opposition to the instant motion, Plaintiffs cite Defendants' expert's purported position that

26  "the only time that really matters to the person making the 911 call" is the *total* response time," i.e. "the

27  time between when the call is entered into the system and when the responder actually shows up at the

28  scene."  Pl. Opp. Mot. Summary Adj., 13, quoting Expert Witness Declaration of Dr. Stephen Klein on

Behalf of Defendants, dated October 13, 2006) ("Klein Decl."), Brosnahan Decl, Ex. R, ¶ 8.[5] Klein's

data is below.

**Table 1:  Number of Priority 1 Incidents with Both a Dispatch and a Response Time For Various Geographic Areas in the Unincorporated Portion of Stanislaus County: January 1, 2002 through August 17, 2004**

| Geographic Area | Number of Incidents | Mean Number of Minutes | | |
|---|---|---|---|---|
| | | Dispatch | Response | SSD Time |
| The Garden | 731 | 8.3 | 15.2 | 6.9 |
| Bret Harte | 1,979 | 6.9 | 12.9 | 6.0 |
| Hatch-Midway | 517 | 6.8 | 12.8 | 6.0 |
| Robertson Road | 706 | 7.3 | 13.1 | 5.8 |
| Plaintiff Neighborhoods | 3,933 | 7.2 | 13.4 | 6.2 |
| Latino Islands | 4,883 | 7.0 | 13.0 | 6.0 |
| White Islands | 1,030 | 5.5 | 12.5 | 7.0 |
| Del Rio | 223 | 2.7 | 12.9 | 10.2 |
| All Unincorporated | 37,152 | 5.5 | 13.3 | 7.8 |

SSD Time = Stanislaus Sheriff Department Time = Time between when dispatched to a responder and when responder arrives on scene.

**Table 2:  Number of Priority 1 Incidents with Both a Dispatch and a Response Time For Various Geographic Areas in the Unincorporated Portion of Stanislaus County: August 18, 2004 through December 31, 2005**

| Geographic Area | Number of Incidents | Mean Number of Minutes | | |
|---|---|---|---|---|
| | | Dispatch | Response | SSD Time |
| The Garden | 365 | 5.2 | 11.5 | 6.3 |
| Bret Harte | 860 | 3.7 | 9.0 | 5.3 |
| Hatch-Midway | 238 | 8.7 | 14.4 | 5.7 |
| Robertson Road | 302 | 3.6 | 8.7 | 5.1 |
| Plaintiff Neighborhoods | 1,765 | 4.7 | 10.2 | 5.5 |
| Latino Islands | 2,234 | 4.6 | 10.1 | 5.5 |
| White Islands | 595 | 3.6 | 10.9 | 7.3 |
| Del Rio | 159 | 1.1 | 9.6 | 8.5 |
| All Unincorporated | 19,006 | 3.7 | 11.4 | 7.7 |

SSD Time = Stanislaus Sheriff Department Time = Time between when dispatched to a responder and when responder arrives on scene.

---

[5]Defendants' expert, Stephen Klein ("Klein") presented data focused on "reporting districts," which are the smaller geographic areas than "beats," and thus more accurately reflective of the experiences of the neighborhoods. Plaintiffs' expert also focused on reporting districts, allowing for a meaningful comparison.  The data in Klein's report shows statistics from all calculated times–dispatch times, response times, and total response times.  In the chart reproduced above, "SSD Time" represents what County describes "response time" of the patrol unit, while response time is the "total response time," which includes both the dispatch and SSD Times.  Dispatch time meanings remain the same.

16

The total response time–which includes both the dispatch time and the response time of the patrol deputy– reflects the experience of the caller. This data shows that while the dispatch times are slower, the response times by the Sheriff deputies are quicker, yielding no meaningful difference for residents of Latino Unincorporated Areas who call 911.  The difference, if at all, is reduced to seconds. That is, there is a difference of .8 minutes, or 48 seconds between a total response time difference reduced to a fraction of a minute is not proof of an invidious discriminatory custom or intent. See *Gay v. Waiter's & Dairy Lunchmen's Union*, 694 F.2d 531 (9th Cir. 1982).  For these reasons, Plaintiffs have failed to establish a prima facie case for a violation of the Equal Protection Clause.

Plaintiffs also raise an issue of deputy assignment.  Defendants argue that Plaintiff neighborhoods always receive the first assignment of patrol deputies because their need is the greatest. DeLeon Decl., ¶21.  Raul DeLeon, Captain of the Sheriff's Office declared that when there is a personnel shortage, because of illness, vacation or training, after the Sheriff's obligation to the contract cities, "other portions of the unincorporated County may be left without a patrol in their areas because the deputies that are available will be sent to South and West Modesto where the Plaintiffs' neighborhoods are located." *Id.* Plaintiffs argue that this claim is misleading because it does not address the dispatch times (discussed above) and does not discuss the allocation of community deputies.  There is a dispute as to whether Del Rio, a small community which is 85% White, has been assigned a community deputy.

Plaintiffs argue that the "dilatory response times are a product of insensitive and discriminatory attitudes at the Sheriff's Department." Pl. Opp. Mot. Summ. Adj., 15. As evidence, Plaintiffs describe that a Sheriff deputy once commented to a plaintiff, "Why should we do anything in [Plaintiff] neighborhood because its going to remain the same?" Another person living in the Robertson Road area testified that when she told the Sheriff's department about a sign posted by her White neighbor ("My dog likes to eat fat Mexican cows,"), the deputy took over half and hour to respond and did not confront the neighbor (he told her it was free speech).  Finally, Plaintiffs point to a "Pockets Study" in 2002 initiated by the Sheriff and City Police Department to address "excessive response times to call-for-service."  That Pockets Study was abandoned.  Plaintiffs argue that this evidences the discriminatory intent of Defendants because, "actions foreseeable and anticipated disparate impact are relevant evidence

to prove the ultimate fact, forbidden purpose." *Columbus Board of Education v. Penick*, 443 U.S. 449, 464 (1979).

As discussed above, Plaintiffs must demonstrate that custom or practice is motivated by invidious racial discrimination. Here, Plaintiffs do not demonstrate a custom or policy. They have not shown that the time it took for deputies to respond at that time would have been different if it were in a different neighborhood. This is especially true, given the response time evidence of Sheriff deputies. Plaintiffs have also not demonstrated a discriminatory custom or policy in the assignment of deputies.

Further, Plaintiffs have not sufficiently addressed or provided evidence to support a claim on the basis of (1) the discriminatory effect of the official action, (2) the historical background of the decision, (3) the specific sequence of events leading up to the challenged decision, (4) departure from the normal procedural sequence, (5) departures from the normal substantive [standards], and (6) legislative or administrative history of the decision. *Arlington Heights*, at 266-68. The comment made by the deputy is not the type of action which would assign *respondant superior* liability to the County or Sheriff on a Section 1983 claim. See *Walker v. City of New York*, 974 F.2d. 293. The Pockets Study was for all unincorporated islands and there is no evidence presented that the abandonment of the project was motived by racial discrimination. Therefore, Defendants' motion for summary adjudication on this issue is GRANTED.

### 2. Bilingual Services

#### a. Standard of Review

Plaintiffs claim that the County, Sheriff, and Dispatch Agency "fail to take appropriate steps to provide alternative communication services in Spanish to the Spanish-speaking residents of the Latino Unincorporated Neighborhoods" which constitutes a violation of the Equal Protection Clause. Where governmental action disadvantages a suspect class or burdens a fundamental right, the conduct must be strictly scrutinized and will be upheld only if the government can establish a compelling justification. *Washington v. Davis*, 426 U.S. 229, 96 S. Ct. 2040 (1974). If a government action is facially neutral, but motivated by a discriminatory purpose, then is also subject to strict judicial scrutiny. *Id.* But, where a suspect class or fundamental right is not implicated, the challenged action need only be rationally related to a legitimate governmental purpose. See *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S.

432, 440, 105 S. Ct. 3249 (1995).

Plaintiffs argue that this Court should use strict scrutiny in this case.  A similar issue was raised in *Moa v. City of Chico*, 324 F. Supp. 2d 1132 (E.D. Ca. 2004).  In that case, Plaintiffs charged that the municipal defendant's failure to provide interpreters to translate between a police officer and Hmong residents and the consequent delay in filing the claim by the police officer violated the Equal Protection Clause.  Similar to the Plaintiffs in this case, the Plaintiffs in *Moa* argued that they were discriminated against based on race or ethnicity in the provision of policy services and protection because of the lack of interpreters and slow filing of the police report.  In that case, the Court noted

> Where the government to target a particular language group for differential treatment, the inference might be drawn that the intended target is the racial or ethnic group closely associated with that language group.  But the facts and allegations here do not involve the singling out of one language group for a denial of interpreter services...

*Moa*, 324 F. Supp. 2d 1132, 1138.  Plaintiffs have presented neither evidence nor allegations that Spanish has been singled out as the only language that has been denied interpreter or bilingual services.[6]

Thus, "as long as a municipal policy or practice distinguishes among people for reasons other than race and does not burden the enjoyment of a fundamental right, it will be upheld against an equal protection challenge if it is rationally related to a legitimate governmental interest."  *Id.*, citing *Mass Bd. of Retirement v. Murgia*, 427 U.S. 307, 312-14 (1976).  "A classification is implicitly made, but it is on the basis of language, i.e., English-speaking versus non-English speaking individuals, and not on the basis of race, religion or national origin.  Language, by itself, does not identify members of a suspect class."  *Soberal-Perez v. Heckler*, 717 F.2d 36 (2d Cir. 1983) (holding that failure to provide forms and services in the Spanish language does not on its face make any classification with respect to Hispanics as an ethnic group); *Vialez v. New York Housing Authority*, 783 F. Supp. 109 (D. NY 1991) (holding that housing authority's failure to provide documents to plaintiff in Spanish does not implicate a protected class); *Moa v. City of Chico*, 324 F. Supp. 2d 1132 (E.D. Ca. 2004) (holding that police failure to provide Hmong interpreter did not amount to ethnic discrimination in an Equal Protection claim).  Therefore, unless Plaintiffs can prove this non-suspect classification has a racially-discriminatory

---

[6]In fact, as described below, the County and Sheriff provide a number of forms and services in Spanish, for the benefit of Spanish-speaking residents

motive, the municipal language policies shall be upheld if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." See *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992).

### b. Bilingual services provided by County and Sheriff

The Sheriff provided the following evidence of bilingual services and procedures. Forty-one Sheriff employees receive bilingual pay. There are additional Sheriff employees who speak Spanish, but do not, for whatever reason, receive bilingual pay. If a patrol deputy who speaks only English arrives on the scene of a call for service, and the person requesting assistance speaks another language, the deputy is authorized to call for translation assistance to another Sheriff patrol unit or the California Highway Patrol. If no other law enforcement units are available, the deputy has the discretion either to request the complaining party to come to the Sheriff's office where a translator can be found or they may utilize the assistance of an uninvolved, third-party civilian at the scene. All deputies carry a written version of the Miranda warnings in Spanish and English so as to adequately advise a criminal suspect of his or her legal rights. The Sheriff provides any information or directive it issues to the public in Spanish as well as English. Sheriff deputies who speak Spanish are frequently present in the Latino unincorporated neighborhoods.

The County also provided evidence of its bilingual services. In announcing public meetings, including those related to the improvement of the Plaintiff Neighborhoods, the County places advertisements in the local English-language newspaper in Spanish and in local Spanish-language newspapers. All County departments relevant to this lawsuit have staff who speak Spanish and communicate with residents who speak Spanish. The County hired an individual for the Public Works Department, the Department of Community Planning, and the Redevelopment Agency, whose first language is Spanish and whose duty is to be on call every day to answer questions in Spanish regarding projects, complaints, technical questions, and other issues. This position has been filled for several years. This employee is also responsible for translating all documents for public dissemination for those departments into Spanish. The County conducts community meetings regarding infrastructure projects in Spanish and English.

Plaintiffs do not dispute that the Sheriff and County provide these services. Instead, Plaintiffs

center the bilingual services argument on the Dispatch Agency's failure to provide adequate bilingual

services.  Thus, for the services of the County and Sheriff, Plaintiffs do not argue inadequate bilingual

services or discriminatory customs, policies or procedures.  Therefore, Defendants' motion for summary

adjudication regarding these services is GRANTED.

### c. Bilingual Services of Dispatch Agency

Plaintiffs argue that the duty of the County, the Sheriff, and the Dispatch Agency arises from Cal.

Gov. Code Section 7293, which requires in part:

> Every local public agency, as defined in Section 54951, serving a substantial number of
> non-English speaking people, shall employ a sufficient number of qualified persons in
> public contact positions or as interpreters to assist those in such positions, to ensure
> provision of information in the language of the non-English-speaking person.

According to Peter Morrison, an expert proffered jointly by the City and the County, approximately 7.2

percent of the persons whom the Dispatch Agency serves are Hispanics of limited English proficiency.

See Brosnahan Decl, Ex. Y (Decl. Of Peter A Morrison in Support of Defendant City of Modesto's

Motion for Summary Adjudication as to Police Service, and Bilingual Assistance in Police Service), ¶

7.  Plaintiffs also assert an argument based on Cal. Gov. Code Section 11135, which is not currently at

issue in this motion.  The Court will not consider that argument.

According to Paul Stein, Director of the Dispatch Agency, there are two ways in which the

agency is able to provide bilingual services to those who are in of limited English proficiency and are

in need of emergency services–bilingual staff members and Network Omni.  There are a total of 45

dispatchers responding to calls for emergency services.  Stein Decl, 6.  Five of these dispatchers are

bilingual in Spanish and receive extra pay for being certified as bilingual proficient.  *Id.*  Stein asserts

that the Dispatch Agency is always looking for dispatchers who are bilingual in any language, especially

Spanish, and "have made contacts and tried outreach efforts into the Latino/Hispanic community for

years to recruit additional Spanish-language dispatchers."  *Id.*  Plaintiffs do not dispute these statements.

The Dispatch Agency further provides bilingual services through the use of Network Omni.

Network Omni is contracted by the State of California, which in turn provides this service free to all 911

dispatch centers in the state.  Stein Decl., 7.  The non-party Dispatch Agency discussed in this lawsuit

also receives this translation service free of charge.  *Id.*  Stein explains that as soon as a call-taker at the

Dispatch Agency "determines that the call is being placed by a person of limited or no English proficiency" then will first determine whether a bilingual dispatcher is available. *Id.* "[I]f there is no available bilingual dispatcher free to take the call, the caller is asked to wait momentarily.  A dispatcher then connects the call to Network Omni without ever putting the caller on hold.  This transition and connection takes only a few seconds to complete." *Id.*  Thus, if a dispatcher utilizes Network Omni, "a bilingual operator (of whatever language is needed to complete the call) will come on the line immediately and translate between the dispatcher and the caller." *Id.*

Plaintiffs do not dispute that the Dispatch Agency employs bilingual dispatchers and utilizes Network Omni.  Rather, they offer testimony of Stein, wherein he declares that he has "never <u>not</u> hired an applicant who was both qualified for the job and Spanish speaking."  Brosnahan Decl, Ex. CC (Klein Decl.), ¶4.  Klein further declared that the Dispatch Agency "advertises that fluency in Spanish is highly desired and since 2002 provides extra pay to applicants who complete training, speak Spanish, and become bilingual certified." *Id.*  Thus, Plaintiffs have proffered no evidence that there was any racial motivation to discriminate against the Latino unincorporated neighborhoods.  Rather, Plaintiffs' evidence shows that the Dispatch Agency has sought actively to provide bilingual services.  Therefore, this Equal Protection argument does not require a strict scrutiny standard of review.

A classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. *Heller v. Doe*, 509 U.S. 312, 319-20 (1993).  In *Moa*, former Chief Judge Levi of the Eastern District of California noted that, "[W]hile it might be a laudable goal for [counties] to provide interpreters for all language groups in the provision of all services, the practical ability to met that goal in a diverse nation in an era of limited public funds may be doubted.  Nor out the Equal Protection Clause to dictate budget priorities by elevating language services over all other competing needs." *Moa*, 324 F. Supp. 2d 1132, 1138.  Despite this low standard,  11% of the dispatchers speak Spanish to serve 7.2% of a population that speaks Spanish.  The Dispatch Agency provides additional bilingual services through its use of the Network Omni.  Thus, the bilingual services currently offered by the Dispatch Agency, County, and Sheriff, at the very least, are rationally related to a legitimate government purpose.  Therefore, Defendants' motion for summary adjudication on this issue is GRANTED.

**C.      Title VI of the Civil Rights Act**

Pursuant to 42 U.S.C. § 2000d, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  As previously discussed by this Court[7], the Supreme Court has held that private parties may not invoke Title VI regulations to obtain redress for disparate-impact discrimination because Title VI prohibits only intentional discrimination.  *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).  Because the Court finds no evidence of intentional discrimination in the provision of protective services or bilingual services and no invidious denial of these services on the basis of race, Plaintiffs can not sustain a Title VI claim.  Furthermore, there is evidence that the Dispatch Agency does not receive any federal money.  Therefore, any of Plaintiffs' claims based on the activities of the Dispatch Agency must fail.  Accordingly, Defendants' motion for summary judgment on Title VI is GRANTED.


**IV. CONCLUSION**

For the foregoing reasons, the Court ORDERS:

(A)     Defendants' motion for summary adjudication on Equal Protection Claim relating to protective services and bilingual services is GRANTED in favor of Defendants; and

(B)     Defendants' motion for summary adjudication on Title VI Claim relating to protective services and bilingual services is GRANTED in favor of Defendants.

IT IS SO ORDERED.

**Dated:    July 2, 2007                              /s/ Lawrence J. O'Neill**
                                                UNITED STATES DISTRICT JUDGE

---

[7]See MTSA Order, p. 20.

23