1

2

3

4

5

6

7  **IN THE UNITED STATES DISTRICT COURT**

8  **FOR THE EASTERN DISTRICT OF CALIFORNIA**

9

10  THE COMMITTEE CONCERNING              CASE NO. CV-F-04-6121 LJO DLB
    COMMUNITY IMPROVEMENT, et al,

11                                        **ORDER ON COUNTY'S MOTION**
                      Plaintiffs,          **FOR SUMMARY JUDGMENT OR IN THE**
12        vs.                              **ALTERNATIVE SUMMARY**
                                           **ADJUDICATION RE SEWERS, SIDEWALKS**
13  CITY OF MODESTO, et al,                **CURBS, GUTTERS AND STORM DRAINS**
                                           (Doc. 333)
14                    Defendants.
                                   /
15

16        This motion is the third of four motions by the County of Stanislaus challenging plaintiffs'

17  allegations of discriminatory provision of public services.  Specifically, plaintiffs challenge Stanislaus

18  County's policies regarding funding and construction of public infrastructure (sewers, storm drains,

19  curbs and gutters, and sidewalks).  Plaintiffs' claims relate to the County's infrastructure spending

20  policies as embodied in the "Priorities List" adopted by the County Board of Supervisors on March 23,

21  2004.

22                          **FACTUAL AND PROCEDURAL BACKGROUND**

23        This is an action for declaratory and injunctive relief by plaintiffs The Committee Concerning

24  Community Improvement, South United Neighbors and individuals living in certain unincorporated

25  areas  in the County of Stanislaus.  The individual plaintiffs reside in neighborhoods which are

26  informally known as "Bret Harte," "Rouse-Colorado," or "Hatch-Midway" and "Robertson Road" and

27

28

1

are predominately Latino neighborhoods.[1]  Plaintiffs allege that these Latino neighborhoods receive

fewer and poorer public services and infrastructure than other neighborhoods in Modesto with

predominantly white populations.  As relevant to this motion, the public infrastructure includes lack of

sidewalks and street lights (Third Amended Complaint "TAC" ¶38-41), inadequate storm drainage and

sewage disposal (TAC ¶46-50), and lack of curbs and gutters.  (Id.)  Plaintiffs allege that white

neighborhoods get higher priority for construction of needed infrastructure:

> 49. The County has also discriminated against the Latino Unincorporated Neighborhoods
> through its prioritization of, and spending on, infrastructure for unincorporated areas.
> County officials have stated that installation of sewer is the County's top infrastructure
> priority. In addition, the need to avoid or eliminate islands such as the Latino
> Unincorporated Neighborhoods, which are surrounded by the City of Modesto, is not
> only state policy (see, e.g., California Government Code § 56744) but also has been
> adopted as policy by the City and the County. Yet the County's spending on
> infrastructure has been very small in relation to the County's total budget, and what
> infrastructure projects the County has installed have not been prioritized so as to afford
> priority to sewer projects in the island neighborhoods. The Rouse-Colorado and
> Hatch-Midway neighborhoods are densely populated urban neighborhoods in dire need
> of sewer service. Despite the County's asserted prioritization of sewer installation and
> the development and annexation of island neighborhoods, installation of sewer in the
> Rouse-Colorado and Hatch-Midway areas has not been undertaken and has been
> prioritized substantially below non-sewer projects in  predominantly White, non-island
> areas such as Salida and Keyes.

As relevant to this motion, the Third Amended Complaint alleges the County and the City

violated plaintiffs' rights by:

> (1) denial of Equal Protection and Civil Rights (42 U.S.C. §1983); and

> (2) violation of Title VI of the Civil Rights Act of 1962, 42 U.S.C. §
> 2000d and 42 U.S.C. §1983 based on the City and County's use of federal
> funds;

Defendant County of Stansilaus moved for summary judgment on May 22, 2007. (Doc. 333-346.)

Plaintiffs filed their opposition on June 12, 2007. (Doc. 367-373.)  Defendant filed its reply on June 26,

2007. (Doc. 383-391.)  On July 10, 2007, plaintiffs filed a surreply. (Doc. 405-410.)  On July 11, 2007,

defendant requested leave to file a sur-surreply, which the Court denied.  Having considered the moving,

opposition, reply and surreply papers, as well as the Court's file, the Court issues the following order.

---

[1]  "Rouse-Colorado" is known as "the Garden", and "Hatch-Midway" is also known as "No Man's Land."

# ANALYSIS AND DISCUSSION

**A.** **Summary Judgment Standard**

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact." F.R.Civ.P. 56( c); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467 (1962); *Jung v. FMC Corp.*, 755 F.2d 708, 710 (9th Cir. 1985); *Loeh v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984). The criteria of "genuineness" and "materiality" are distinct requirements. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The requirement that an issue be "genuine" relates to the quantum of evidence the plaintiff must produce to defeat the defendant's summary judgment motion. There must be sufficient evidence "that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

"As to materiality, the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial," and in such circumstances, summary judgment should be granted "so long as whatever is before the . . . court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56( c), is satisfied." *Celotex Corp. v. Catarett*, 477 U.S. 317, 322 (1986). "If the party moving for summary judgment meets its initial burden of identifying for the court those portions of the material on file that it believes demonstrates the absence of any genuine issues of material fact," the burden of production shifts and the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quoting F.R.Civ.P. 56(e)).

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968) *T.W. Elec. Serv.*, 809 F.2d at 631. The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted). The

3

1   opposing party's evidence is to be believed and all reasonable inferences that may be drawn from the

2   facts placed before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255;

3   *Matasushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

4   **B.      Equal Protection and Discrimination under 42 U.S.C. §2000d**

5          Plaintiffs allege two federal claims of discrimination.  Both claims require proof of intentional

6   discrimination.  Plaintiffs filed a civil rights, 42 U.S.C. § 1983 ("Section 1983") action, alleging Equal

7   Protection violations and violation of Title VI (42 U.S.C. §2000d).

8          Section 1983 "creates a private right of action against individuals who, acting under color of state

9   law, violate federal constitutional or statutory rights." *Squaw Valley Development Co. v. Goldberg*, 375

10  F.3d 936, 943 (9th Cir. 2004).

11      **1.      Standards of Proof of Equal Protection Violations**

12      To state a viable Equal Protection claim under Section 1983, "a plaintiff must show that the

13  defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership

14  in a protected class." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001).  Proof of racially

15  discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.  *City of*

16  *Cuyahoga Falls, Ohio v. Buckeye Community Hope Foundation*, 538 U.S. 188, 194, 123 S.Ct. 1389,

17  1394 (2003).

18      Official action will not be held unconstitutional solely because it results in a racially

19  disproportionate impact. "Disproportionate impact is not irrelevant, but it is not the sole touchstone of

20  an invidious racial discrimination." *See Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2049

21  (1976) (holding that disparate impact is insufficient for an Equal Protection Clause violation claim).

22  Indeed, proof of discriminatory intent is required to show that state action having a disparate impact

23  violates the Equal Protection Clause. *See Village of Arlington Heights v. Metropolitan Housing Dev.*

24  *Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

25      Direct evidence of discriminatory purpose and intent may be unavailable.  In such a situation,

26  the court must make "a sensitive inquiry into such circumstantial and direct evidence of intent as may

27  be available." *Arlington Heights*, 429 U.S. at 266.  "The court must therefore look to the totality of the

28  relevant evidence to determine whether invidious discriminatory purpose was a motivating factor for the

4

decision." *Id.* The impact of the official action whether it "bears more heavily on one race than another," may provide an important starting point in the analysis. *Arlington Heights,* 429 U.S. at 264-265, 266. A variety of factors may be considered.  The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes.  *Arlington Heights*, 429 U.S. at 267.  The specific sequence of events leading up to the challenged decision also may shed some light on the decision maker's purposes.  *Arlington Heights*, 429 U.S. at 267.  Departures from the normal procedural sequence and the legislative or administrative history are also relevant.  *Id.* at 268.  Thus, the factors a court considers: (1) the discriminatory effect of the official action, (2) the historical background of the decision, (3) the specific sequence of events leading up to the challenged decision, (4) departure from the normal procedural sequence, (5) departures from the normal substantive standards, and (6) legislative or administrative history of the decision. *Id.* at 266-68.

> **2.    Plaintiffs' Claim of Discrimination in the Priorities List**

Plaintiffs challenge the County Board of Supervisors' adoption of the Priorities List in March 2004.  The Priorities List sets forth the County's priority of construction of infrastructure.  Plaintiffs claim that the Priorities List discriminates against the plaintiff neighborhoods of Hatch-Midway, Rouse-Colorado, Bret Harte and Robertson Road by funding infrastructure in other communities, which are predominately white, rather than infrastructure in their predominantly Latino communities.  Plaintiffs argue that in setting forth its infrastructure priorities in 2004, the Board of Supervisors observed that, "The most critical need is for public sanitary sewer." (Doc. 367-26, Brosnahan decl., Exh. U, Bates SC22497.)  Yet, as plaintiffs argue, the County ignored those needs for racial purposes.[2]

---

[2] Defendant argues that plaintiffs have failed to identify a policy or custom to support their *Monell* claim.  Defendant argues that the decision to install storm drains in the Keyes neighborhood is insufficient under *Monell* to support plaintiffs' claims.  The basic rule of liability under *Monell* is "local governing bodies . . .  can be sued directly under §1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018 (1978).  "The existence of a policy, without more, is insufficient to trigger local government liability under section 1983." *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992).  "[O]fficial policy must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983." *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445 (1981) (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. 2018).  Here, plaintiffs argue that the adoption of the Priorities List is the official policy, decision or regulation which resulted in constitutional discriminatory injury.  For purposes of this motion, the Court accepts the plaintiffs characterization and moves to the merits of the claim.

### 3.    Lack of Infrastructure in the Plaintiff Neighborhoods

Plaintiffs' neighborhoods were built in the 1940s and 1950s during which time California law did not require home builders to provide infrastructure such as sewers, storm drains, gutters, curbs, street lights, or sidewalks.  (Doc. 372, Response to Undisputed Facts, no. 8, 9, 12, 13.)  When the houses were built, they used septic tanks and lacked the remaining infrastructure.  (Doc. 372, Response to Undisputed Facts, no. 12, 13.)   Plaintiffs do not argue that the initial lack of infrastructure arises from any discriminatory conduct.[3]

Plaintiffs do not dispute that providing infrastructure turns largely on how the infrastructure will be financed.  (Doc. 372, Response to Undisputed Facts, no. 18.)  It is undisputed that funding has been limited for numerous reasons such as limited tax revenue (as a result of Proposition 13, Proposition 218, among others) (Doc. 372, Response to Undisputed Facts, no. 28-35), the State budgetary crisis (Doc. 372, Response to Undisputed Facts, no. 65), and spending mandates from the state and federal government. (Doc. 372, Response to Undisputed Facts, no. 48-54, 78).  For instance, in fiscal years 2003-04 and 2004-05, Stanislaus County lost $4.5 million each year in revenue due to actions taken by the State of California to balance its own budget. Over the last eight years, the County has used an average of $9.1 million per year of Fund Balance in the General Fund to balance the upcoming year's budget.  (Doc 372, Response to Undisputed Facts, no. 63-74.)

In light of ongoing funding issues, Stanislaus County created the Stanislaus County Redevelopment Agency in February 1989.[4]  (Doc. 372, Response to Undisputed Facts, no. 90.)  The County included as part of the project areas for redevelopment three main priorities including drainage

---

[3] The infrastructure each of the plaintiff neighborhoods currently lacks is as follows. The Hatch-Midway neighborhood lacks sewer lines, storm drains, sidewalks, curbs and gutters. (Doc. 385, Defs Response to Plaintiffs Disputed Facts, no. 26.) The Rouse-Colorado neighborhood lacks sewer lines, sidewalks, storm drains, curbs and gutters. (Doc. 385, Defs Response to Plaintiffs Disputed Facts, no. 8.) The Bret Harte neighborhood received sanitary sewer installation in 1995, but lacks storm drains, curbs and gutters, and sidewalks (except for sidewalks around the Bret Harte school). (Doc. 385, Defs Response to Plaintiffs Disputed Facts, no. 2; Doc. 372, Response to Disputed Facts, no. 268-69.) The Robertson Road neighborhood is now having sewer installed, but still lacks storm drains, curbs and gutters, or sidewalks. (Doc. 385, Defs Response to Plaintiffs Disputed Facts, no. 111.)

[4] The Stanislaus County Redevelopment Agency is financed by property tax increment, which is the difference between the established property value on one date compared to the value at a later date. Property tax increment deposits are expended on behalf of and within the project area to eliminate blight and blighting conditions. (Doc 372, Response to Undisputed Facts, no. 84-87.)

facilities, street improvements, and sewer systems. (Doc. 372, Response to Undisputed Facts, no. 91.)
It is undisputed that eighteen communities were evaluated for redevelopment using various analyses,
including but not limited to studies for land use and zoning, property condition and exterior structures,
infrastructure deficiencies (including County-wide new facilities to support social services
administration as well as local retrofitting for public facilities and infrastructure), and ratios of land
values. (Doc. 372, Response to Undisputed Facts, no. 92, 94.) Four of the six islands with the largest
Latino populations were included. (Doc. 372, Response to Undisputed Facts, no. 112, 113.) The first
major project to be sponsored by redevelopment was the  municipal sewer collection and distribution
system in Bret Harte, which was completed in 1995. (Doc. 372, Response to Undisputed Facts, no. 97;
Doc. 384, Defs' Reply To Plaintiff, Fact 97.)

    **4.**        **Preparation and Adoption of the "Priorities List"**

        **a.**        **The Priorities List**

On March 23, 2004, the Board of Supervisors issued findings prioritizing infrastructure projects
for neighborhoods and towns throughout the unincorporated County. The Board listed sixteen areas of
the County in terms of priority, with construction of the first four of the sixteen areas already then
underway. It is undisputed that all of the neighborhoods stated in the Priorities List have deficiencies and
need infrastructure. (Doc. 372, Response to Undisputed Facts, no. 301.)   Indeed, plaintiffs
neighborhoods are not the only unincorporated areas that lack storm drains, sidewalks, curbs and gutters.
(Doc. 372, Response to Undisputed Facts, no. 303.)

| Priority # | NEIGHBORHOOD |
|---|---|
| 1. | Bret Harte (completed as to sewer and partial sidewalks) |
| 2. | Salida (completed) |
| 3. | Shackleford (north section completed) |
| 4. | South Ceres |
| 5. | Robertson Road (in progress) |
| 6. | Keyes (approved) Redevelopment and CDP area |
| 7. | Airport Neighborhood (partially completed) |
| 8. | Empire |

1   9.          West Modesto – South of Paradise (excluding Robertson Road)

2   10.         North Ceres

3   11.         South Modesto of Hatch and Crows Landing Road [including south Shackleford]

4   12.         South Turlock

5   13.         West Modesto – South of Maze, north of Paradise

6   14.         Central Turlock

7   15.         West Modesto – North of Maze

8   16.         North Modesto – Coffee-Sylvan; McHenry Mobilehome Park

9   (Doc. 372, Response to Undisputed Facts, no. 198.)   The total estimated cost of all structural

10  improvements (sewer/storm drains, sidewalks, curbs, gutters) to these areas was then estimated to be

11  $172,794,670. (Doc. 372, Response to Undisputed Facts, no. 201.) The cost of completing only the

12  sewer/storm drain improvements and deferring construction on the surface improvements was

13  approximately $76,150,860.  (Doc. 372, Response to Undisputed Facts, no. 202.)

14               **b.     The Preparation of the Priorities List**

15          The undisputed evidence establishes that the Priorities List was prepared by James Duval, deputy

16  Director of the County of Stanislaus Planning and Community Development Department.  (Doc. 334,

17  Duvall Decl. ¶¶1, 28.)  Mr. Duvall testified how he prepared the List:

18          Q:     Can you explain to me what the list - - how you created the list?

19          A:     The list consists of unincorporated territory within the sphere of influence of the City of
20                 Modesto, City of Turlock, as well as other communities that are stand alone communities
                   like Salida and Keyes.  And they are on the list because they lack the infrastructure that
21                 would be entertained for use of either redevelopment or Community Development Block
                   Grant funds.

22          Q:     And the neighborhoods are numbered.  Is that in order of priority?

23          A:     At the time of the preparation of the list, no.  They were just listed chronologically.

24          Q:     Chronologically according to?

25          A:     As the list expanded from one to sixteen, they were numbered one through sixteen.

26          Q:     Was the intent to do number one before number two and number two before number
                   three?

27

28

8

1       A:       Certainly items one through four would be that way because as they are shaded on the report or on the table, they were either completed or in some - - at some level of completion.  (Doc. 367-16, Duval Depo. P.241-242.)

Mr. Duval testified that the first four neighborhoods on the List were so listed because the infrastructure improvements were either completed or in progress, based on the availability of funding:

Q:       Now, for the first four, why are they placed in this order?

A:       As we discussed earlier, Bret Harte was going to be the first project implemented by the Redevelopment Agency once it instituted itself.  Salida because of the opportunity to obtain USDA funding.  Shackleford because of the surface improvement that were going to be built by others, the Redevelopment Agency considered it an efficient use of funds to do something prior to or during the construction of surface improvements.  South Ceres because there was some Stanislaus Ceres redevelopment commissioned dollars that were associated with the installation of sewer and water mains in the neighborhood, and so it's on here so that we would allocate CDBG dollars to the individual lateral connections for those properties, both water and sewer. . .  (Doc. 367-16, Duval Depo. P.242-243.)

Mr. Duvall further explained that the first four projects were underway and that the rest of the list had similar characteristics - lack of infrastructure:

A:       . . . We were already in planning states for Robertson Road.  Keyes was the next project that we were considering as far as redevelopment.  The rest of the list then is listed based on the same characteristics as those projects that precede them.

Q:       What do you mean by that?

A:       Lack of different sorts of infrastructure.

Q:       Were you the one who conducted the analysis that [the] Airport [neighborhood] should be next, then [the] Empire [neighborhood]?

A:       No, I prepared the list knowing that these areas lack the infrastructure that was constructed for items one through four as well as the infrastructure that's lacking that we have not done anything.  It became a priority in this order.  Once it was presented to the Board of Supervisors, they looked at this, they took it as a list of priority, adopted it that way, and this is the list we use.  (Doc. 367-16, Duval Depo. P.243-244.)

In creating the list, Mr. Duval testified he did not intend the list to be a "priority list," but merely a listing of infrastructure needs in the County:

Q:       But that was not your intent in preparing the list to make this a priority ranking?

A:       My first intent was to list those areas that were lacking in the infrastructure.  If it became a priority, it became a priority, because there was no further analysis done on whether or not one would be in need of something first rank than the other.  (Doc. 367-16, Duval Depo. P.244.)

9

In preparing the List, no attempt was made to prioritize which needs were more pressing or important than others. (Doc. 370, Pls' Disputed Facts no. 83.) Mr. Duval explained that the Keyes neighborhood was number five on the list because the first four were completed or in progress and Keyes was the next neighborhood planned by the Redevelopment Agency:

> Q:    And then Keyes was next why?
>
> A:    Because it was on the redevelopment implementation plan as the next community, the next project.
>
> Q:    But then starting with [the] Airport [neighborhood], this is just a spread sheet that shows the needs of those separate neighborhoods?
>
> A:    Correct.

The Keyes storm drain project is listed next as Priority No. 6.   (Doc. 370, Pls' Disputed Facts no. 87.) Keyes was listed as Priority No. 6 because it was on the redevelopment implementation plan as the next community.  (Doc. 370, Pls' Disputed Facts no. 87)

Thereafter, the Priorities List was adopted by the Board of Supervisors as a listing of the priority of infrastructure construction, and was unchanged from Mr. Duval's list.  It was adopted by the Board of Supervisors on March 23, 2004.  (Doc. 370, Pls' Disputed Facts no. 81, 82.)

**C.    No Direct Evidence of Discrimination**

Plaintiffs have not presented direct evidence of intentional discriminatory conduct in the preparation or adoption of the Priorities List.  Plaintiffs do not present any evidence of racial considerations by the Board during the process, racial comments or racially related topics.  Plaintiffs do not present evidence of racial considerations by Mr. Duval in preparing the list.[5]  Rather, plaintiffs rely exclusively upon circumstantial evidence.

**D.    *Arlington* Factors**

In *Arlington Heights v. Metropolitan Housing Development Corp.*, the Supreme Court identified some of the circumstantial evidence that is relevant when discriminatory intent is at issue: (1) the discriminatory effect of the official action, (2) the historical background of the decision, (3) the specific

---

[5] The Court merely assumes, without analysis for purpose of this motion, Mr. Duval's intent could be imputed to the County.  However, as no evidence of discriminatory intent by Mr. Duval is presented, the issue of "imputed conduct" is moot.

1   sequence of events leading up to the challenged decision, (4) departure from the normal procedural

2   sequence, (5) departures from the normal substantive standards, and (6) legislative or administrative

3   history of the decision. *Arlington Heights*, 429 U.S. at 266-68.

4          **1.      Discriminatory Effect**

5          Plaintiffs' primary argument is that storm drains are being installed in other, predominately

6   white, neighborhoods instead of the more needed sewer systems in their neighborhoods.  Plaintiffs argue

7   that the Keyes neighborhood should not receive funding for storm drains, because plaintiffs'

8   neighborhoods do not yet have sewer services.  Sewers are more of a necessity than storm drains.

9   Plaintiffs argue that installing sewer in Hatch-Midway was inexplicably demoted to number 11 on the

10  Priority List. By deciding to spend the huge sum of $20-30 million for the Keyes storm drainage project,

11  the County has seriously compromised its ability to serve more pressing projects that, by the County's

12  own standards, should be higher priority in the majority Latino Plaintiff neighborhoods.   Both plaintiff

13  neighborhoods, Hatch-Midway (15.5 residents per acre) and Rouse-Colorado (13 residents per acre), are

14  densely populated, and therefore, replacing failing septic systems with sanitary sewer in Hatch-Midway

15  and Rouse-Colorado should be the top priority for the County.  Instead, the County has prioritized

16  installation of storm drains in white communities like Keyes that are already served by sanitary sewers.[6]

17         As this Court has noted in these parties' other summary judgment motions, impact alone is not

18  determinative. *Arlington Heights*, 429 U.S. at 266 and at n.15.  This Court has analyzed how statistical

19  evidence should be used.   In its prior Order on Defendants' Motion on the Master Tax Sharing

20  Agreement (Doc. 329, Order on May 16, 2007, p.15.), this Court noted that the Plaintiffs' statistical pool

21  inadequately compared neighborhoods: "Plaintiffs' [sic] selectively analyze the Latino population within

22  each of the three impacted county islands, but do not adequately statistically analyze the Latino

23  population in relation to either the total population or total Latino population." (Doc. 329, Order on May

24  16, 2007, p.15.)

25  ─────────────────

26         [6] Plaintiffs argue that this Court has noted in its prior order that septic systems are the County's most important
    infrastructure priority and that the septic tanks are failing. (See Amended Order on Defendant's Motions for Summary
    Judgment or in the Alternative Summary Adjudication on Sewers (Doc. No. 347) (Brosnahan Decl. Ex. BB)).  This Court
27  has not made a finding of fact that septic tanks are failing.  In its order, the Court gave plaintiffs every reasonable inference.
    "[A]ll reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing
28  party." *Anderson*, 477 U.S. at 255

The appropriate comparison pool for purposes of the "first step" under *Arlington* of "disparate impact" should be the group(s) affected by the challenged decision.  *See Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1185 (9th Cir. 2002) (The statistical evidence, however, must be drawn from appropriate comparison pools. In the context of statistical analysis, comparison "pools" are the groups of individuals from which data is collected and compared), *cert. denied*, 537 U.S. 1110 (2003); *Lowe v. Commack Union Free School Dist.*, 886 F.2d 1364 (2d Cir. 1989) (the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of the applicants for jobs or promotion because of their membership in a protected group. According to the court, the statistical disparities must be sufficiently substantial so as to raise an inference of causation), *cert. denied*, 494 U.S. 1026 (1990).

Here, plaintiffs mainly argue that other predominately white neighborhoods are receiving infrastructure ahead of the plaintiff neighborhoods. Plaintiffs focus almost their entire argument with a comparison of their neighborhood with the Keyes neighborhood and whether Keyes is in greater need of infrastructure.  Plaintiffs fail to consider the totality of the Priorities List, as a whole, or even the population served by the infrastructure in their impact analysis.  The Priorities List does not favor white over Latino neighborhoods.  It is undisputed that plaintiff neighborhoods, Bret Harte and Robertson Road, are higher on the Priorities List than the Keyes neighborhood and have received sewer infrastructure.[7]  The Shackleford neighborhood received sewer, storm drain and full infrastructure and is predominately Latino.[8]  (Doc. 372, Response to Undisputed Facts, no. 158, 227, 307.)  The next two

---

[7] For a third plaintiff neighborhood, Robertson Road (priority rank 5), the County originally envisioned a project for Robertson Road that would have paid for all infrastructure, but then the state budget crisis occurred. The state pulled back state money that was earmarked for the project.  As money started to trickle in, the Robertson Road residents had to choose between installation of sewers or storm drains.  After accumulating funds for several years, the sewer construction began in 2006. (Doc 372, Response to Undisputed Facts, no 282-290.)

[8] Plaintiffs complain that the Shackleford neighborhood received full infrastructure, sewer, streets gutters, sidewalks, storm drains, before any of the plaintiff neighborhoods received basic sewer service.  The evidence submitted in support of this contention is that "Former County Supervisor Caruso, the primary backer of the Shackleford project on the Board of Supervisors, has acknowledged his ownership of substantial properties in the neighborhood – an office complex, five retail stores, several warehouses, and a parking lot in Shackleford proper on the east side of Crow's landing Road, as well as additional retail stores in a shopping center immediately adjacent to Shackleford on the west side of Crow's Landing Road." (Caruso Depo. ( Brosnahan Decl. Ex. P) at 6:2-8:13 & 24:17-26:22.)

Plaintiffs have not offered any evidence of discriminatory motive in support of construction of Shackleford full

neighborhoods on the Priority List, after the Keyes neighborhood, to receive sewer are Airport (priority rank 7 and 54.6% Latino population) and Empire (priority rank 8 and 58.7% Latino population), both of which are predominately Latino.   At the opposite end of the Priorities List, the bottom two neighborhoods on the List (West Modesto - North of Maze, and North Modesto) are predominately white neighborhoods.   (Doc. 371, Response to Undisputed Facts, no. 302.)   Thus, some Latino neighborhoods have been given priority over white neighborhoods.   Some predominately white neighborhoods have the lowest priority.   As a result, the priority of the neighborhoods is not a stark pattern explainable only on discrimination grounds. *See*, *e.g.*, *PMG Intern. Div. L.L.C. v. Rumsfeld*, 303 F.3d 1163, 1172 -1173 (9th Cir. 2002) ("A disparate impact claim, under the equal protection clause of the Fifth Amendment, challenging a facially neutral-statute requires showing of discriminatory intent, or of a stark pattern of disparate enforcement); *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (Alabama legislature changed City of Tuskegee's boundaries so that all but a handful of the 400 African-American residents could not vote in city elections); *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (San Francisco banned laundries in wooden structures, and then issued variances to every white applicant but one and denied variances to every Chinese applicant).

The parties dispute whether the Keyes neighborhood is predominately Latino or predominately

---

complement of infrastructure.  Indeed, it is undisputed that Shackelford is predominately Latino. (Doc. 372, Response to Undisputed Facts, no. 200, 223, 226.)  The evidence establishes that Shackelford was constructed its full complement of infrastructure possibly due to political force, and availability of funding. There is no evidence the decision was based upon discriminatory motive. (Doc. 385, County's Response to Dispute Facts, no. 46, 47, 48; Doc. 372, Response to Undisputed Facts, no.230 "Undisputed that the decision to choose Shackelford over the other areas was based in part on its proximity to Bret Harte . . ."; Fact. 279: "This was a decision bases solely on economics and lack of funding.")

Plaintiffs argue plaintiff neighborhood Hatch-Midway is adjacent to Shackelford and did not receive infrastructure. County argues that plaintiff neighborhood Hatch-Midway did not receive sewer at the time as the Shackelford neighborhood because the cost of the sewer connection under the irrigation lateral. (Doc. 345, Moving papers p. 24.) Plaintiffs dispute that the traversing the irrigation lateral was cost prohibitive. (Doc. 372, Response to Undisputed Facts, no. 277.) Plaintiff does not dispute, however, that the decision to provide sewer service to Hatch-Midway at a later time was based solely on economics and lack of available funding. (Doc. 372, Response to Undisputed Facts, no. 279.) Hatch-Midway was later dropped from Shackelford redevelopment, as priority no. 3, and moved to priority no. 11. (Doc. 372, Response to Undisputed Facts, no. 280.) At the time of sewer installation, Shackelford was majority Latino. (Doc. 372, Response to Undisputed Facts, no. 273.) Thus, a sewer installation benefitted a Latino population

white.  The point is a distinction without a difference.[9]  The Keyes neighborhood is but one neighborhood on the Priorities List.  As explained *infra*, a comparison of what occurred in this one neighborhood with that of the plaintiff neighborhoods is too narrow.

Plaintiffs challenge the placement of their neighborhoods on the Priorities List, and that their neighborhoods did not get the highest priorities.  Plaintiffs attempt to create an issue of fact that Keyes does not have a more severe storm/flooding problem than plaintiffs' own neighborhoods.  Plaintiffs submit evidence that a private investigator photographed intersections in Keyes which the County contends were water impacted.  The investigator did not find standing water in Keyes, but found standing water in the plaintiff neighborhoods, sometimes the width of a street.  In addition, plaintiffs argue a more pressing need for storm drains exists in their neighborhoods, rather than in the Keyes neighborhood.

Plaintiffs present no evidence that the placement on the Priorities List was, in any way, the result of discriminatory motive.  They argue that their neighborhoods' needs are greater.  However, the undisputed evidence is that **all** the neighborhoods on the Priorities List have infrastructure needs for which there is not enough money. (Doc. 372, Response to Undisputed Facts, no. 301.)  Indeed, plaintiffs neighborhoods are not the only unincorporated areas that lack storm drains, sidewalks, curbs and gutters.  (Doc. 372, Response to Undisputed Facts, no. 303.)  A facially neutral law is not invalid under the Equal Protection Clause merely because it has a greater impact upon members of one race than another. *Washington v. Davis*, 426 U.S. 229, 239 (1976).  Accordingly, the effect, if any, is insufficient to raise a reasonable inference of discriminatory impact. [10]

---

[9] Plaintiffs dispute that the Keyes neighborhood is predominantly Latino, and thus, whether the Keyes project benefits Latinos. According to the 2000 Census data, Keyes was 49% Latino. (Doc. 372, Response to Undisputed Facts, Fact no. 252.)  In its motion, the County used the 2000 Census data to predict that by the current year of 2007, Keyes would be more than 50% Latino. Plaintiffs dispute that the County should predict demographic trends.  Regardless, plaintiff has failed to show that the statistical variation between 49% and, as plaintiff terms it, being "predominately Latino" is constitutionally significant.

[10] Plaintiffs argue that the Board collected racial diversity information and had that information available for consideration.  Indeed, plaintiff offers evidence that the 1991 Community Development Plan contained demographic data. (Doc. 372, Response to Undisputed Facts, no 272.) Plaintiffs argue the Community Development plan included demographic statistics of Hispanic members of the plaintiff neighborhoods, and that as a matter of common sense, local government officials have a basic understanding of the racial make-up of people they are supposed to serve.  For instance, a May 27, 2003 petition signed by persons in the Bret Harte neighborhood was signed by persons with Spanish surnames which the County

1          2.     **The Historical Background of the Decision**

2          Plaintiffs argue that the County-stated priority is that "the most critical need is for public sanitary

3    sewer."  Plaintiffs argue that installing sewer in Hatch-Midway and in Rouse-Colorado should be the

4    County's highest priorities.  Plaintiffs argue that the Priorities List deviates from the stated policy.

5    Installing sewer in Hatch-Midway was inexplicably demoted to number 11 on the County's Priority List.

6    As densely populated areas, replacing failing septic systems with sanitary sewer in Hatch-Midway and

7    Rouse-Colorado should be the top priority for the County.  Instead, the County has prioritized

8    installation of storm drains in white communities like Keyes that are already served by sanitary sewers.

9    The County is also installing sewer in South Ceres, a predominately white area.[11]

10         A Keyes storm drainage project was identified as a potential project by the Redevelopment

11   Agency as long ago as 1991.  (Doc. 372, Response to Undisputed Fact, no. 108: "In June 1991, the

12   County understood that the highest concentration for residential uses in the Redevelopment Project area

13   were in the Brett Hart, Empire, Shackelford and Keyes.") The Redevelopment Agency included a

14   drainage project for Keyes in its Redevelopment Report.  (Doc. 335, Duval Decl., Exh.N, Bates no.

15   SC512.)

16

17   ───────────────

18   must have noticed.  (Doc. 385, Defs' response to Pl's disputed facts, fact no. 66 (Duval Decl. at 39 & Exhibit S at SC 9328, page 100 of 118; Duval Decl. Ex. T (Shackelford Community Development Plan) at SC 9426).)) Plaintiffs invite this Court

19   to infer racial animus based upon the existence of the demographic data.  This evidence, however, is insufficient to raise an issue of fact.  Plaintiffs must produce evidence that the decision was motivated by racial animus.  The inference that a

20   governmental entity was merely <u>aware</u> of its demographics/racial statistics does not turn a governmental decision into one <u>motivated</u> by racial animus. This Court is unwilling to accept plaintiffs proffered inference.  Such inference would open the

21   floodgates of attacks on every unfavorable governmental decision by disgruntled citizens solely because the government "knew" its demographics.  *See PMG Intern. Div. L.L.C. v. Rumsfeld*, 303 F.3d 1163, 1173 (9th Cir. 2002) (On a motion to dismiss, rejecting the inference that because all eight Board members and their alternates are non-Hispanic whites, and

22   because the Board has only two women, their classification decisions are based on discriminatory intent.) *Compare Flores*

23   *v. Pierce*, 617 F.2d 1386, 1389 (9th Cir. 1980) (It was shown that the defendant city officials deviated from previous procedural patterns, that they adopted an ad hoc method of decision making without reference to fixed standards, that their decision was based in part on reports that referred to explicit racial characteristics, and that they used stereotypic references

24   to individuals from which the trier of fact could infer an intent to disguise a racial animus), *cert. denied*, 449 U.S. 875, 101

25   S.Ct. 218, 66 L.Ed.2d 96 (1980).

26         [11] Plaintiffs argue that the County is not effectively spending money.  For instance, plaintiffs argue the County has committed $15 million to the Gallo Center, in spite of pressing infrastructure needs.  Defendant states that this is irrelevant

27   and in any event was funded by bond debt.  This evidence fails to raise an issue of fact of discriminatory motive as to the decision adopting the Priorities List. There is no evidence showing it was in any way racially motivated.  Even if this is "bad

28   fiscal policy," as plaintiffs argue, it does not equate to discriminatory motive.

1    Plaintiffs argue that the scope of the current Keyes storm drainage project bears no resemblance

2    to the intended Redevelopment Agency project.  (Doc. 372, Response to Undisputed Fact, no. 239.)

3    This current project is vastly larger, costing nearly $20 million, over an original project of $150,000.

4    However, as the County notes in its reply, a Keyes project was on the planning block for a

5    significant time.  The scope of the project enlarged to accommodate changes in Federal Environmental

6    Protection Agency oversight (Duval Supplemental Decl. ¶11) and to connect with new housing

7    infrastructure near Keyes.  The enlarged project was required to install necessary infrastructure. (Duval

8    Supplemental Decl. ¶11.)

9    Plaintiffs present no evidence that the change in scope to an enlarged project resulted from a

10   discriminatory motive.  Discriminatory purpose, "implies more than intent as violation or intent as

11   awareness of consequences.... It implies that the decisionmaker ... selected or reaffirmed a particular

12   course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an

13   identifiable group." *Feeney*, 442 U.S. at 279, 99 S.Ct. at 2296 (1979). That the <u>effect</u> of the project scope

14   is that less money is available for other projects does not raise an issue of fact of whether the <u>motive</u> for

15   the funding or the project was discriminatory.[12]  Again, it is undisputed that storm drains are needed

16   infrastructure in the Keyes neighborhood.

17   Plaintiffs' request for a remedy untethered to a constitutional violation, though sincere,

18   misunderstands the nature of the judicial power. The courts are not empowered generally to "make

19   things right." *Knight v. Alabama*, 476 F.3d 1219, 1229 (11th Cir. 2007).  To avoid summary judgment,

20   plaintiffs must "produce evidence sufficient to permit a reasonable trier of fact to find by a

21   preponderance of the evidence that [the] decision ... was racially motivated." *Keyser v. Sacramento City*

22   *Unified School Dist.*, 265 F.3d 741, 754-55 (9th Cir. 2001) (It is unsurprising that summary judgment

23   _____

24   [12] The parties argue at length what the water table in Keyes is, as compared to the water tables in other
     neighborhoods in the County.  County argues the Keyes project was deemed a high priority because of the extremely high
25   seasonal water table in the Keyes area. Plaintiffs argue the water table under Bret Harte, like that of the other plaintiff
     neighborhoods, is lower than Keyes.  Soils data show that the soils in Keyes are either moderately well drained or well
26   drained to excessively well drained. The water table level in either Keyes or the plaintiff neighborhoods does not raise an
     issue of fact.  It is undisputed that storm drainage was needed infrastructure in Keyes. Plaintiff have not cited to any authority
27   that Equal Protection requires a governmental entity to evaluate a more "pressing need." Rather, Equal Protection requires
     that the governmental entity not be motivated by racial animus.  Whether "need" for infrastructure exists is evaluated under
28   the rational review basis because infrastructure need is not a suspect classification.  See *infra*.

1   decisions with regard to § 1983 claims are remarkably similar to their Title VII counterparts. The court

2   affirmed summary judgment for the employer where 1) there was little to no direct evidence of

3   discriminatory intent, 2) the employer offered legitimate, non-discriminatory reasons for its actions, and

4   3) the employee did not show these reasons were false or pretextual.)

5           **3.      The Specific Sequence of Events Leading Up to the Challenged Decision and**

6                     **Departure from the Procedural and Substantive Norm**

7           Plaintiffs argue that substantive and procedural irregularities give rise to an inference of

8   intentional discrimination.  Plaintiffs argue, according to the County's stated priorities, installing sewer

9   in Hatch-Midway and Rouse-Colorado should be its top priority. Yet, the County is installing storm

10  drains in Keyes. The County's actual spending priorities are not the priorities dictated by County policy.

11  Moreover, plaintiffs argue the "specific sequence of events" in which the County's Priority List was

12  approved is characterized by procedural irregularity. Mr. Duval, the County official who prepared the

13  list, testified that he made no attempt to prioritize listed projects by need.

14          The Board of Supervisors' background and discussion, in adopting the Priorities List,

15  demonstrate the sequence leading up to the decision.[13]  (Doc 367-36, Brosnahan Decl., Exh. U, Bates

16  no. SC22497.)  First, in 2004, the Board was considering the request for reallocation of funds between

17  projects due to anticipated shortfall:

18              "On February 10, 2004, the Board of Supervisors considered a request
                from the Planning Department to reallocate Community Development
19              block Grant (CDBG) funds from one public infrastructure project
                (Robertson Road Sewer) to another (Keyes Storm Drain).   This
20              recommendation was made by staff due to the lack of funds available to
                complete the entire infrastructure improvements needed to bring this
21              neighborhood up to City of Modesto standards for ultimate annexation to
                the City."  (Doc 367-36, Brosnahan Decl., Exh. U, Bates no. SC22497.)
22

23  Thus, lack of funding to complete Robertson Road infrastructure, according to City of Modesto

24

25

26  ───────────────

27      [13] Recommendations were made to the Board of Supervisors, which the Board adopted.  The parties have introduced
    a document which is entitled "Consideration and Approval of Recommendations from the special Board Committee consisting
28  of Supervisors Grover and Supervisor Mayfield regarding the allocation of Community Development Block Grant Funds."
    (Doc. 367-36, Brosnahan Decl., Exh. U, Bates no. SC22496.)

standards, was an impedance to reallocating funds.[14] (Doc. 372, Response to Undisputed Facts, Fact no. 170, 174, 175.) Before deciding the reallocation of funds, the Board wanted information on other infrastructure needs within the County:

> "Before taking action on the reallocation request, the Board wanted additional information relative to the need for infrastructure in other areas of the county and to ensure that countywide priorities were clear on these community improvements." (Doc 367-36, Brosnahan Decl., Exh. U, Bates no. SC22497.)

A phased approach to infrastructure construction was adopted by the Board. First, underground improvements - both sewer and storm drain - would be constructed, then above ground infrastructure would be addressed:

> "As the Board committee, we are recommending that the Board of Supervisors consider a phased construction approach to meet the most urgent underground (sewer/storm drain) needs first, then return to each neighborhood later as additional funds become available to complete the remaining improvements. (Doc 367-36, Brosnahan Decl., Exh. U, Bates no. SC22498.)

Storm drains and sewers, as underground improvements, were to be constructed first within the county:

> "The priority list identifies sixteen areas within Stanislaus County that need underground infrastructure (sewer, water, storm drain). Four of the sixteen priorities indicate progress in infrastructure construction. This approach would allow projects to begin now, based on the most urgent needs throughout the county based on the prioritized list of projects established by the Board of Supervisors. (Doc 367-36, Brosnahan decl., exh. U, Bates no. SC22498.)

The evidence establishes that the Board of Supervisors considered the funding for the projects. In addition, the priority of construction was considered - the construction of underground infrastructure, before construction of surface infrastructure. The County is consistent in it policy that underground infrastructure be constructed first. There was a need for storm drains in Keyes, as well as elsewhere in the County. (Doc. 372, Response to Undisputed Facts, no. 301.) Storm drains are underground construction.

In this case, a series of events unconnected to the racial considerations required the Board to make a large number of choices relating to type of infrastructure, method of payment, costs, geographic

---

[14] The City's standards for construction of infrastructure was separately considered in the City's motion for summary judgment. (Doc. 332, Order of May 22, 2007.)

1  considerations, among other considerations, in deciding which infrastructures would be prioritized.  The

2  parties present a long history and explanation of funding requirements, shortfalls in county budgets,

3  restrictions on funding, infrastructure deficiencies and planning and related problems.  State-wide

4  changes in financial resources of local entities impacted funding for infrastructure. The County's actions

5  can be explained by a myriad of community and planning concerns having nothing to do with the

6  ethnicity.

7       Plaintiffs argue that the County has produced no documentary evidence showing that County

8  officials made a decision to place the Keyes storm drain project ahead of sewers in Hatch-Midway or

9  Rouse-Colorado because the supposed flooding problems in Keyes were considered to be as serious as

10  or more serious than the lack of sewers in Hatch-Midway or Rouse-Colorado.

11      It is not the County's burden to demonstrate they satisfied a greater need, it is plaintiffs' burden

12  to prove that there was intentional discriminatory conduct.

13      In reviewing the totality of the evidence, plaintiffs' evidence boils down to alleged discrimination

14  because plaintiffs' neighborhoods do not yet have storm drainage and/or sewers, and are predominately

15  Latino.  This evidence is insufficient to raise an issue of fact.  Plaintiffs have failed to demonstrate

16  through direct or circumstantial evidence that the County intentionally discriminated on the basis of race

17  in the Priorities List.

18  **E.**      **Rationally Related to the Legitimate Governmental Purpose**

19      Plaintiffs argue, that if the Court does not find the Priorities List intentionally discriminatory, the

20  Priorities List is unconstitutionally arbitrary.  Plaintiffs argue the Priorities List is arbitrary because it

21  is not rationally related to a legitimate governmental purpose. Plaintiffs argue that James Duval, the

22  person who prepared the Priorities List, testified that the list was not prepared according to need, and

23  thus, the County made its land use decisions arbitrarily.  Further, plaintiffs argue the List is irrational

24  because it affirmatively conflicts with the County's stated priority of the installation of sewers in place

25  of septic systems as its most important infrastructure priority.

26      The Priorities List is not intentionally discriminatory, and therefore, it is reviewed under the

27  rational basis review. Rational review under Equal Protection is highly deferential.  *Kahawaiolaa v.*

28  *Norton*, 386 F.3d 1271, 1280 (9th Cir. 2004), *cert. denied*, 125 S. Ct. 2902, 162 L. Ed. 2d 294.  The

1   Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification in

2   the challenged decision, the legislative facts on which the classification is apparently based rationally

3   may have been considered to be true by the governmental decisionmaker, and the relationship of the

4   classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.

5   *Kahawaiolaa v. Norton*, 386 F.3d at 1280 (sustaining under rational basis standard exclusion of native

6   Hawaiians from tribal recognition process for Indian tribes).   The challenged classification comports

7   with equal protection if there is "any reasonably conceivable state of facts that could provide a rational

8   basis for the classification." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096,

9   124 L.Ed.2d 211 (1993).

10   Rational-basis review in equal protection analysis "is not a license for courts to judge the

11   wisdom, fairness, or logic of legislative choices." *Heller v. Doe by Doe*, 509 U.S. 312, 319, 113 S.Ct.

12   2637, 2642 (1993).  It does not authorize "the judiciary [to] sit as a superlegislature to judge the wisdom

13   or desirability of legislative policy determinations made in areas that neither affect fundamental rights

14   nor proceed along suspect lines." *Heller*, 509 U.S. at 319, 113 S.Ct. at 2642.   A classification neither

15   involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of

16   validity. *Id.*

17   The Priorities List was initially crafted as a summary list of infrastructure needed in the County.

18   The undisputed evidence demonstrates that the infrastructure was not listed by the most pressing need.

19   Significantly, however, it is undisputed that the infrastructure on the Priorities List, are indeed, "needed."

20   For instance, the Keyes neighborhood needs storm drains; the Airport neighborhood needs sewer; the

21   Bret Harte neighborhood needs storm drains; the Hatch Midway neighborhood needs sewers, and other

22   County neighborhoods need other infrastructure.  (Doc. 372, Response to Undisputed Facts, no. 301);

23   *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446, 105 S.Ct. 3249, 3257, 87 L.Ed.2d 313 (1985)

24   ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to

25   render the distinction arbitrary or irrational.")  Thus, the evidence establishes that the Priorities List has

26   a relationship to the infrastructure needs in the County.  Therefore, the List has a rational basis to the

27   need for infrastructure within the County.

28   Plaintiff argues that the Priorities List is arbitrary because it does not list the infrastructure

according to the most "pressing need."  Plaintiffs argue that an evaluation of what infrastructure was needed the most would have disclosed that sewer was <u>more needed</u> in their neighborhoods than storm drains in the Keyes neighborhood.  Plaintiffs argue that Priorities List is inconsistent with County's stated policy of installing public sanitary sewers.

As the Supreme Court has stated, under rational basis review:

> "[T]he Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational."

*Nordlinger v. Hahn*, 505 U.S. 1, 11-12, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (citations omitted).

As shown *infra*, the Board of Supervisors' background and discussion in adopting the Priorities List, demonstrate that there is a rational relationship.  (Doc 367-36, Brosnahan Decl., Exh. U, Bates no. SC22497.)  Lack of funding forced the Board to consider reallocation of funds. (Doc. 372, Response to Undisputed Facts, Fact no. 170, 174, 175.)  The Board considered other infrastructure needs within the County before deciding on reallocation of funds.(Doc 367-36, Brosnahan Decl., Exh. U, Bates no. SC22497.)   A phased approach to infrastructure construction was adopted by the Board, with underground improvements - both sewer and storm drain - to be constructed first, then above ground infrastructure.  (Doc 367-36, Brosnahan Decl., Exh. U, Bates no. SC22498.)

A court may consider the direct links between the legislative findings and the scope of the ordinances. *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 970 (9th Cir. 2003) (noting rational basis standard of review is "highly deferential"), *cert. denied*, 542 U.S. 904 (2004). Here, the evidence establishes that funding for the projects was considered.  In addition, the priority of construction was considered -  the construction of underground infrastructure, before construction of surface infrastructure. Thus, County is consistent in it policy that underground infrastructure be constructed first.  There was a need for storm drains in Keyes, as well as elsewhere in the County.  (Doc. 372, Response to Undisputed Facts, no. 301.) The highly deferential rational relationship test does not warrant this Court's interference in allocation of undisputedly limited funding among projects which were "needed." There is a direct link between the Board's consideration of funding and the priority of construction with that of the Priorities List.  Accordingly, the Priorities List is not arbitrary or irrational.

**F.**     <u>The Issue of Standing</u>

County argues that certain of the plaintiffs lack standing to assert claims for sewer because they already have sewer and that claims by other plaintiffs are moot.

The Court does not reach the standing issue because it resolves the motion on substantive grounds.

G.     <u>Statute of Limitations</u>

County argues that plaintiffs' claims are outside the limitations period and are therefore barred.

The Court does not reach the statute of limitations issue because it resolves the motion on substantive grounds.

**H.**     <u>Proof of Title VI Violations</u>

Plaintiffs' second claim for relief is pursuant to Title VI , under 42 U.S.C. § 2000d, which provides:

> "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

In *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), the Supreme Court held that private parties may not invoke Title VI regulations to obtain redress for disparate-impact discrimination because Title VI itself prohibits only <u>intentional discrimination</u>. The entity involved must be engaged in intentional discrimination and be the recipient of federal funding. *Rodriguez v. California Highway Patrol*, 89 F.Supp.2d 1131, 1139 (N.D.Cal.2000).

/////

/////

/////

/////

/////

/////

/////

/////

1    Defendant argues that, as an initial matter, Plaintiffs' Title VI claim fails on procedural grounds

2    because demonstrate they have sustained an injury from a specific "program or activity receiving federal

3    assistance."

4    The Court does not reach the procedural issue because the Court resolves the claim on

5    substantive grounds.  Plaintiffs' second claim also requires proof of intentional discrimination.  As

6    shown, *infra*, plaintiffs have failed to carry their burden to raise an issue of fact as to the intentional

7    discrimination.  Accordingly, the motion will be granted on the second claims for relief.

8                                          **<u>CONCLUSION</u>**

9    For the foregoing reasons, as to the County, the Court orders as follows:

10   1.      The Court GRANTS the motion as to claims for violation of Equal Protection, and

11   2.      The Court GRANTS the motion as to claims for violation of Title VI of the Civil Rights

12            Act of 1962

13   IT IS SO ORDERED.

14   **Dated:    July 30, 2007**              _____**/s/ Lawrence J. O'Neill**_____
                                              UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28